FRANCES B. GEISEY *v.* DAVID R. HOLBERG ET AL.

JAMES M. GEISEY *v.* FRANCES B. GEISEY ET AL.

JAMES M. GEISEY ET AL. *v.* FRANCES C. GEISEY.

[Nos. 63-65, October Term, 1945.]

*Decided February 7, 1946.*

The causes were argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and MARKELL, JJ.

*John E. Magers* for James M. Geisey in all three appeals.

*Hiram J. Weiskopf* for David R. Holberg, appellee in Nos. 63 and 64.

*Avrum K. Rifman*, with whom was *Thomas J. Kenney* on the brief, for Frances B. Geisey, appellant in No. 63 and appellee in Nos. 64 and 65.

*Louis J. Jira* for Aaron Goldsmith in No. 65.

MARBURY, C. J., delivered the opinion of the Court.

Frances B. Geisey and James M. Geisey were married on August 3, 1943. Each had been married before. Mrs. Geisey had a minor son from her former marriage. On September 30, 1943, Mr. Geisey purchased for $12,000 No. 103 West Twenty-ninth Street in fee simple, paying $4,000 in cash and giving an $8,000 mortgage to George J. Zaiser, George R. Zaiser and Roland D. Zaiser, trustees under the will of Louis F. Zaiser. The title to the property was taken in the name of Mr. and Mrs. Geisey as tenants by the entireties, and the Zaiser mortgage was executed by both of them. Some difficulties arose between the husband and wife in January, 1944, they separated for eleven days, but subsequently started living together again. Their home was an apartment at 29 South Exeter Street, in a building owned by Mr. Geisey and used for his business. The Twenty-ninth Street property was purchased, according to Mr. Geisey, for the purpose of investment and to allow the first floor apartment to be used by Mrs. Geisey's mother and by her minor child by the first marriage, without the payment of any rent. In February, 1944, Mr. Geisey suggested to his wife that they buy some Cigar Store stock. Mrs. Geisey agreed to put in $152 as her share

of the investment, and he paid $1,500 for the stock which was put in her name. A few days later, her husband asked her to sign a power of attorney, so that if he had to sell the stock in a hurry, and she was not available, he could carry out such a transaction. He also told her he had asked his attorney, Mr. John E. Magers, to prepare such a power of attorney. On March 21, 1944, Mrs. Geisey went to Mr. Magers' office to pay the interest due on the Zaiser mortgage, and also to pay an $800 installment on it, thereby reducing it to $7,200. At that time, Mr. Magers had the power of attorney ready, and she signed it. It is admitted by Mrs. Geisey that Mr. Magers read the power of attorney to her, and she signed it, and that he told her correctly that it was a general power of attorney. She took the executed paper home, and gave it to her husband. She said she wanted to sign it without reading it, and would have so signed it. She testified she told Mr. Magers that the power of attorney was for the sale of the stock. Mr. Magers said, that to his knowledge and recollection, there was nothing said by her about it being for that purpose, and that when Mr. Geisey asked him to prepare the power of attorney, he did not mention the stock. Mr. Geisey testified that he had been engaged in the coin machine business about five years; that he bought the Cigar Store stock for $1,500 paying for it, and putting it in his wife's name for income tax purposes. He denies that she ever put up $152, but admits he had $152 of her money, which he afterwards returned to her. He also denies that he ever told her that he wanted the power of attorney merely for the purpose of selling the stock. He admits that he and his wife were on good terms at the time the power of attorney was arranged for, but he gives no explanation of why he wanted it. He kept it until June 29, 1944, when he had it recorded so that he could execute the second mortgage on the Twenty-ninth Street property, hereinafter referred to.

The parties separated finally on May 25, 1944, and Mrs. Geisey went to live with her mother and son in

the Twenty-ninth Street property. On July 25, 1944, Mr. Geisey had the Cigar Stores stock transferred to his own name, and eventually, on December 11, 1944, it was sold for the net amount of $1,899.46.

Mr. Geisey had no bank account and apparently used cash in large amounts in his occupation, which was the retail part of setting up music boxes, cigarette machines and pin ball machines in other persons' places of business. He had borrowed $4,000 from David R. Holberg when he originally bought the Twenty-ninth Street property, and this was used for the cash payment made at that time. He testified that he had made the first payment on the mortgage of $800 and he paid $200 interest which made $5,000 in cash he had put in the property. Mr. Holberg had made a loan to Mr. Geisey in July, 1942, of $1,500 without security which was repaid at the rate of $250 per week. On August 16, 1943, he made another loan of $4,000 without security, repaid at the rate of $200 per week. The "interest" or charge for making this loan was $200. On January 7, 1944, another unsecured loan of $5,000 was made by Holberg to Geisey for which $250 was charged. On July 6, 1944, Holberg lent Geisey $5,000. Holberg said that Geisey came to him and said he needed some money, and he would be willing to give him collateral for it by way of a second mortgage; that he, Holberg, did not ask for collateral. Geisey told Holberg that he had power of attorney to act for his wife. Holberg said he went and looked at the property, and thought the loan was all right, and gave Geisey the money. Holberg said he thought he would have made the $5,000 loan without the second mortgage. He may have loaned him twice that much. Holberg did not ask Geisey where his wife was, or why his wife did not sign the mortgage. He stated that he did not know they were separated, and he did not know who was occupying the house. The mortgage was executed for two years, was signed by Geisey, both for himself and for his wife under the authority of the power of attorney. The check was drawn to the order of Mr.

and Mrs. Geisey and was endorsed by Mr. Geisey and he had it cashed through Silverstein, a friend of his who was in the wholesale coin vending business. None of the proceeds was given to Mrs. Geisey, and she knew nothing about it. Mr. Geisey said he used the money to pay back his business, which was his way of saving the money he took from his cash business capital for the $4,000 cash deposit on the purchase of the property. This he had previously borrowed, without collateral, from Mr. Holberg, and he had repaid the latter. He also had taken from his cash capital the $800 install-ment paid on the first mortgage, and the $200 "interest," or charge, paid to Holberg for the first loan. Mr. Weis-kopf, the attorney representing Holberg in the mortgage matter, said he was told it should be gotten through as soon as possible, that Mr. Geisey needed the money.

In August, 1944, Mrs. Geisey learned for the first time about the Holberg mortgage. She then executed and recorded a revocation of the power of attorney. This came about as the result of a notice sent by Mr. Geisey to Mrs. Geisey's mother on July 24, 1944, notifying her to move from the premises thirty days from date. There-after, on November 4, 1944, Mrs. Geisey filed her bill of complaint, asking that the power of attorney be declared null and void, and that the second mortgage be declared null and void.

Prior to the filing of this bill of complaint, and on July 17, 1944, eleven days after the second mortgage had been given to Holberg, Mr. George C. Rauchhaus, who was in the amusement business, who had known Mr. Geisey several years, and in whose place of business the latter put vending machines on commission, bought the Zaiser first mortgage at the request of Mr. Geisey. The mortgage was not then in default, but Zaiser's at-torney wanted to dispose of it because of trouble he saw coming between the Geiseys, and he told Mr. Geisey he would have to get someone else to take it. Rauchhaus paid for it with a check for $4,000 dated July 14, 1944, on a checking account in the First National Bank in

which a deposit of $4,176.09 had been made the day previous. He explained that the source of that deposit was the sale of a piece of property at Catonsville. His checking account, from the month of April up until the time of this deposit, showed comparatively small balances of from $285 to $555. Rachhaus said that he paid $7,200 for the mortgage and $180 interest. This paid the interest up to September. The difference between these amounts and the $4,000 check was paid by him in cash, which he said he always kept in large sums. Rauchhaus said he purchased the mortgage for an investment but admitted he had never before owned a mortgage. He said that about the latter part of August, or the first of September, Geisey told him he was not going to pay the interest, because he had not effected a reconciliation with his wife. Rauchhaus then employed an attorney to start foreclosure proceedings which were instituted immediately. The auction sale on this foreclosure was held November 13, 1944. Between the time of the institution of the foreclosure proceedings and the sale, a representative of Mrs. Geisey offered to pay Mr. Rauchhaus the full amount of the mortgage and interest if he would give an assignment, but he refused to do this, saying he did not want to do anything to hurt Mr. Geisey. Geisey testified that if a reconciliation had been effected, he would have paid the interest on the Zaiser-Rauchhaus mortgage, but if none were effected, as turned out to be the case, he did not intend to pay it. When the property was sold at foreclosure sale, it was purchased by Aaron Goldsmith, a partner of Mr. Silverstein in the vending machine business, for $14,000. Mr. Goldsmith is a brother-in-law of Mr. Holberg, and at one time had owned real estate, but had kept the title in Mr. Holdberg's name. He testified that Geisey was his friend, and that he went out to the property with Mr. Holberg; that he had loaned Geisey money and that Geisey could have anything he had. The sale was reported to the Circuit Court No. 2 of Baltimore City and Mrs. Geisey filed exceptions to the sale.

The case involving the power of attorney and the Holberg mortgage was heard before Judge O'Dunne. He decreed that the power of attorney was fraudulently obtained by Geisey from his wife, and as between them was fraudulent and that in any accounting between them, it should be treated as null and void, but that the mortgage was valid as to Holberg. From this decree two appeals were taken, one by Mrs. Geisey, which is No. 63, and one by Mr. Geisey, which is No. 64. The exceptions to the ratification of the sale under the first mortgage were heard in a separate case by Judge Sherbow, also in Circuit Court No. 2 of Baltimore City. By this decree the exceptions were sustained, and the trustee making the sale directed to return to the purchaser the deposit. The Court further decreed that the assignment of the first mortgage from the Zaisers to Rauchhaus was a fraudulent assignment, being part of a fraudulent scheme and plan conceived by Mr. Geisey, and that the sum of $4,000 paid by Rauchhaus to the Zaisers' attorney on account of such assignment was declared to be part of the proceeds of the second mortgage to Holberg. The Court declared this payment a credit on the mortgage held by Rauchhaus and the mortgage indebtedness was reduced by $4,000. From this decision, Mr. Geisey, Mr. Rauchhaus and Mr. Goldsmith appealed and this appeal is No. 65.

As a result of these decisions below, the property on Twenty-ninth Street is now subject to the Zaiser mortgage held by Rauchhaus, reduced to $3,200, and to the second mortgage of $5,000 to Holberg.

The record discloses that other proceedings were pending between Mr. and Mrs. Geisey. One was a replevin proceeding ordered instituted by Mr. Geisey for the return of jewelry and a fur coat. Another was a divorce action. The details of these are not shown, nor are they particularly relevant. They are mentioned to show that, when the Geiseys finally separated, there was obviously a great deal of feeling between them, which throws light upon the actions of Mr. Geisey, related in the records before us. He apparently determined to get out of the

Twenty-ninth Street property all the money he had put in it, and then to have it sold at foreclosure sale so that his wife and her mother and small son would be evicted. The first step was to use the power of attorney to execute the second mortgage on the property. It is not necessary for us to decide whether the power of attorney was originally obtained from Mrs. Geisey with any such scheme in view, or whether it was obtained for the purpose for which Mrs. Geisey said she was told it was wanted, namely for the sale of the stock. The power of attorney was sufficiently broad to cover both transactions. It is significant that while Mr. Geisey denies that he ever told his wife that he wanted the power of attorney for the sale of the stock, he gave no explanation whatever as to why he asked for it. It is certainly not a usual proceeding for a husband and wife, living together, to have the wife execute a general power of attorney to the husband. It was used to transfer the stock from Mrs. Geisey's name to that of Mr. Geisey. Whether it was gotten for that purpose alone, and Mr. Geisey afterwards conceived the idea of using it to get his money out of the property he had put in his wife's name with his as tenants by the entireties, is immaterial. If the first is correct, the obtention of it was fraudulent. If its use to make the second mortgage was an afterthought, when it became apparent that the relations between the husband and wife were strained, then such use was fraudulent. The circumstances hardly justify the idea that Mrs. Geisey intended her husband either to get or to use this power of attorney to get all the value out of the Twenty-ninth Street property and to leave her equity in it worth nothing.

The chancellor was not able, however, to connect Mr. Holberg sufficiently with this fraudulent transaction to declare his second mortgage null and void. In this conclusion we are unable to agree. Mr. Holberg was a money-lender and Mr. Geisey was one of his regular customers. His credit was evidently very good. He was able to get unsecured loans first of $1,500, then of $4,000 and then of $5,000, all of which were repaid in

accordance with the terms arranged, and Mr. Holberg received as his compensation, a substantial bonus or sum, which he called interest. Several months after the $5,000 unsecured loan was made, Mr. Geisey came to Holberg and wanted to borrow $5,000 and offered the second mortgage on the Twenty-ninth Street property as collateral. Holberg did not ask for any security and said he would have loaned it without security. The only explanation of giving the mortgage is that this loan was to be for two years. No explanation was given why this was, and the only reason for the loan is that Geisey said he needed some money. Mr. Holberg's attorney was told that the loan should be gotten through as soon as possible because of this need of Mr. Geisey's. Neither he nor Holberg asked where Mr. Geisey's wife was, or why she did not sign the mortgage herself, or why Mr. Geisey was using this power of attorney which he had not had recorded, but which he did get recorded immediately for the purpose. The fact that Holberg knew that Mr. Geisey did frequently need cash and was told that this money was needed by Mr. Geisey, and the fact that the transaction was put through hastily and in a manner unusual for such transactions, lends credence to the fact that Holberg knew it was being done for the purpose of getting rid of Mrs. Geisey's equity in the property.

It is said in *Story on Agency*, 9th Ed., Ch. XVI, Par. 437: "Thus, if an agent tortiously converts the property of his principal; as if he sells or pledges it to a third person, without right or authority, the latter will generally be liable, equally with the agent for the conversion. This doctrine applies in all cases where the third person knew and participated in the illegal or unauthorized act of conversion." This doctrine has been applied in this Court in a number of cases where persons in a fiduciary capacity misapplied funds and the facts show that the third parties had notice that such funds were being diverted to the use of the fiduciary and permitted or assisted in such misapplication. Thus, in the case of

*Swift v. Williams,* 68 Md. 236, 11 A. 835, the Court said that a payment was made by a check on a fund not liable for the debt it paid. The Court held that, not only the debtor who was paid, but the bank which permitted the check to be so used, were liable. The liability of the bank was predicated upon the fact that it permitted a check endorsed by one trustee to be used to open an account when the check itself showed that it had to be endorsed by two trustees. The same principle is followed in two cases involving the trustees of the Bowling estate; *Duckett v. Mechanics Bank,* 86 Md. 400, 38 A. 983, and *Duckett v. Bank of Baltimore,* 88 Md. 8, 41 A. 1061, 1062. See also *Safe Deposit v. Cahn,* 102 Md. 530, 62 A. 819; *National Union Bank v. Miller Rubber Co. of New York,* 148 Md. 449, 129 A. 688; *Baltimore American Insurance Co. v. Ulman,* 165 Md. 630, 170 A. 202; and *Hospelhorn v. Emerson,* 175 Md. 207, 200 A. 378.

On the authority of these cases, it seems clear that since Holberg was on notice that Geisey was attempting to convert Mrs. Geisey's equity into money to be used by himself, therefore, his second mortgage must be held to be null and void as against the Twenty-ninth Street property. This, of course, does not affect the relationship of creditor and debtor between Holberg and Geisey.

Mr. Magers, who represented the Zaisers in placing the first mortgage on the Twenty-ninth Street property and who was also Mr. Geisey's attorney, knew that trouble was brewing in the Geisey family in which he did not want his clients, the Zaisers, to be involved. He, therefore, informed them that they should dispose of the mortgage and at the same time told Mr. Geisey that the latter must arrange to get some one else to take it over. Geisey sent Mr. Rauchhaus to Mr. Magers and as a result, Rauchhaus bought the mortgage. Rauchhaus was one of Geisey's customers and was visited by him once or twice each week. He had never before owned a mortgage, but said he had asked Geisey to get him a good investment for his money. From the appearance

of his bank account, however, he had very little money to invest. He not only paid the fair value of the mortgage and the interest due, but paid a premium in the shape of additional interest not due for two months. Where he got the money to buy this mortgage is not satisfactorily explained. The chancellor found that $4,000 of the cash which he paid the Zaisers was in fact a part of the fund obtained by Geisey on the Holberg mortgage. There is strong reason for suspicion that this may have been so, but we are unable to find it as a fact. We do find, however, that Rauchhaus acted in no way as a *bona fide* purchaser of a mortgage for purposes of investment. Geisey admitted that he had no intention of keeping up the interest on the mortgage if a reconciliation with his wife were not effected. He told Rauchhaus that he was not going to pay the interest, although Rauchhaus does not admit that this was done prior to his purchase of the mortgage. Rauchhaus refused to assign the mortgage to a nominee of Mrs. Geisey, even though he would get back the principal and interest, at a time when he knew his mortgage had not turned out to be a good investment. He said his refusal was because he did not want to hurt Mr. Geisey, indicating clearly that his whole purpose in taking over the mortgage was to help Mr. Geisey. Rauchhaus immediately put in motion foreclosure proceedings, getting a consent decree, under the method used in Baltimore City, appointing his attorney trustee to make the sale. Mr. Holberg went to the sale, taking with him his brother-in-law, Mr. Goldsmith who was engaged in the wholesale vending machine business and in that business was well known to Mr. Geisey, and was a good friend of his. Mr. Goldsmith bought the property, thereby carrying out the obvious purpose of Mr. Geisey in the whole transaction, of wiping out his wife's equity.

Fraud cannot be easily proved by direct evidence because of the secrecy with which it generally is surrounded, but a court of equity cannot close its eyes to a series of circumstances, all pointing one way, indicating

one purpose in view. The purchase by Rauchhaus of the Zaisers' mortgage was clearly not in his own interest, but obviously was in the interest of Geisey as part of a scheme to destroy his wife's equity. Rauchhaus, by helping his friend, Geisey, helped to participate in a fraud on Mrs. Geisey. Goldsmith who was also a friend of Geisey, and a brother-in-law of Holberg and a partner of Silverstein in the wholesale coin vending business, did his part by buying the property, something entirely foreign to his usual practice. His action is sought to be upheld as a perfectly legitimate purchase by a statement that he was impressed by the rentals announcement by the auctioneer. The auctioneer denied making any such announcement.

It is contended on the authority of *Patapsco Guano Co. v. Elder,* 53 Md. 463; *Slingluff v. Stanley,* 66 Md. 220, 7 A. 261, and *Turpin v. Miles,* 108 Md. 678, 71 A. 440, that the validity of the Rauchhaus assignment cannot be attacked by exceptions to the ratification of the sale made under the provisions of the mortgage assigned. These cases hold that where the court has passed upon the validity of a mortgage, or an assignment for the benefit of creditors or has passed a decree directing a sale, the proper method of testing the validity of the instrument or decree attacked, is by a direct appeal from the decree, and, if this is not done, such an attack cannot be subsequently made by exceptions to a sale. The situation here, however, is entirely different. The decree in this case is a consent decree, passed by virtue of the power inserted in the mortgage at the time of its execution. The parties were not heard, nor is any adjudication made of the merits of the case. A similar situation exists where a sale is made under power of sale contained in a mortgage and in such a case, this Court has said that the statute preserves to the mortgagor a right to show by exceptions that the mortgage was invalid. *Albert v. Hamilton,* 76 Md. 304, 25 A. 341, approved, *Bachrach v. United Co-operative,* 181 Md. 315, 29 A. 2d 822. See *Miller's Equity,* Par. 484; *Seebold v. Lockner,* 30 Md. 133; *Black v. Carroll,* 24 Md. 251, 255.

In the case before us, it is not claimed that the mortgage was invalid, but that the assignment and the sale were fraudulent, being parts of a fraudulent scheme, to which Geisey, the assignee and the purchaser were parties, to extinguish the interest of Geisey's wife in the property. We think this claim is clearly substantiated by the evidence. The purchaser, if he were innocent of any participation in the fraud, would nevertheless be involved in a fraudulent sale, which would taint his title. But, as we have already said, we think there is sufficient evidence in the case to connect the purchaser in this matter with the attempts of Geisey to defraud his wife. The chancellor, therefore, was, in our opinion, correct in sustaining the exceptions and setting aside the sale and in holding that the assignment to Rauchhaus was fraudulent. We do not agree that there is sufficient evidence in this case to justify his conclusion that $4,000 should be credited on the mortgage because it was advanced by Geisey, and we do not feel called upon at this time to decide whether it was or not, or if it was, what the legal consequences would be.

As a result of our conclusion, the property remains subject to the full amount of the first mortgage, diminished only by the $800 payment made on the principal. If this conclusion leaves Rauchhaus in an anomalous position, he has only himself to blame.

> *Decree in No. 63 and No. 64 affirmed in part and reversed in part, with costs to the appellant in No. 63; the costs in No. 64 to be paid by James M. Geisey, and case remanded for further proceedings in accordance with this opinion. Decree in No. 65 affirmed in part and reversed in part, with costs to appellee, and case remanded for further proceedings in accordance with this opinion.*