## CHARLES A. MORAN *v.* MARY A. O'BRIEN.

[No. 42, October Term, 1928.]

*Decided January 15th, 1929.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, J.J.

*Daniel S. Sullivan,* for the appellant.

*Robert Biggs,* for the appellee.

DIGGES, J., delivered the opinion of the Court.

On the 18th day of May, 1909, Elizabeth Moran, the then owner of a lot of ground in Baltimore City known as 1615 Aisquith Street, conveyed the same to her son, Charles A.

Moran, by a deed which on its face is a fee simple deed. The appellee in this case, Mary A. O'Brien, daughter of Elizabeth Moran and sister of the appellant Charles A. Moran, filed her bill of complaint in the Circuit Court of Baltimore City, in which she prayed the court to decree that while the aforesaid deed is in the usual form of a fee simple conveyance, nevertheless, in fact, her brother Charles A. Moran received this property not as his fee simple property but as trustee for the complainant. The bill also prayed for an injunction restraining the appellant from the further prosecution of an ejectment suit against the appellee, which had theretofore been instituted in the People's Court of Baltimore City. An answer to the bill was filed, and testimony taken in open court. The chancellor by his decree sustained the contentions of the plaintiff and granted the relief prayed for. It is from that decree the appeal is prosecuted.

This court has on numerous occasions declared its policy to be not to reverse in equity cases findings of fact made by the chancellor, especially where the testimony was taken in open court, whereby opportunity was afforded the court to observe the appearance, demeanor and manner of testifying of the various witnesses produced, or, in other words, to obtain the atmosphere of the case, which, of course, is denied to this tribunal on appeal; unless we are convinced that such findings are clearly not warranted by the evidence contained in the record. After giving full effect to the above stated policy, and critically examining the evidence, we find ourselves unable to agree with the conclusion reached by the chancellor.

Before commenting upon the testimony and its effect, it is to be noted that the bill does not contain any allegation of fraud on the part of the appellant, or any undue influence exercised by him upon his mother, the grantor in the deed. Neither does the testimony disclose the slightest evidence of either fraud or undue influence. The appellee's case is based upon alleged declarations made by the appellant to the appellee after the death of their mother, to the effect that the property 1615 Aisquith Street belonged to the appellee, which, together with other circumstances, it is contended, is

sufficient to establish that Charles A. Moran, while holding a deed for the property in fee simple, nevertheless took it not as his own property but as trustee for his sister.

The record contains testimony on the part of the appellee and one or two other witnesses to the effect that Mrs. Moran, the mother, on several occasions made declarations that the property in question here was to become the property of the appellee, but that she could not leave it in her daughter's name for the reason that the daughter's husband, to whom it is shown she had an antipathy, might have an interest in it, and therefore she would have to convey it to her son Charles to hold for the daughter. These alleged declarations were made out of the presence of the appellant, and, upon exception duly taken to this testimony, the chancellor ruled it out. We are of the opinion that such ruling was correct.

As stated, there is nothing in the pleadings or evidence which indicates that the attack in this case upon the deed is made by reason of fraud, duress, undue influence, or want of mental capacity. The admission is that the deed was made nearly a year before Mrs. Moran's death, when she was mentallly capable and not subjected to any undue influence, duress, or fraud practiced upon her; the contention being that, while she made the deed, it was her intention that it be given a legal effect different from and at variance with the terms employed in the deed. The evidence is that the deed was prepared by an attorney of the Baltimore bar, now deceased, of experience and integrity, at the direction of Mrs. Moran; the only connection the son Charles A. Moran having with the preparation and execution of the deed being that, at his mother's request, about two weeks before the deed was executed, he told the attorney that his mother desired to see him, and that he was present at the execution of the deed, which took place in the parlor of the mother's home, 1615 Aisquith Street. The preparation and execution of the deed, so far as the record discloses, is the only business about which Mrs. Moran desired the services of this attorney. Mrs. Moran died in February, 1910, and these alleged declarations made by her, as to her intention in respect to giving the property to her

daughter were made prior to the execution of the deed. We are unable to bring ourselves to the point of believing that, if it had been Mrs. Moran's intention to convey 1615 Aisquith Street to her son, as trustee for her daughter, she would not have mentioned that fact to her attorney at the time he was receiving instructions for the preparation of the deed; and if she had, it is inconceivable that an experienced and honest attorney would have adopted the form which the deed took, to carry out such an intention. Again, it is most improbable that if the mother wanted to constitute the son trustee for her daughter, she would not have acquainted him with that fact; and there is no evidence on the part of any witness for the complainant that the mother ever said that such was her intention in the presence of the son, and the son testifies that she never did in any way convey to him knowledge that, while the deed was to be a fee simple one to him, she intended thereby to constitute him a trustee for her daughter. This view is strengthened by another fact disclosed by the record. Mrs. Moran had a deceased son Joseph, who had left, upon his death, two children; and in 1904, about six years prior to her death and five years prior to the making of the deed in question, she had executed a will and placed it, together with the sum of $250 or $300, in the hands of Mgr. Foley. This will was produced in evidence, and by its terms the property 1615 Aisquith Street was devised to her son Charles A. Moran, the appellant, subject to the payment of $600 by Charles, in semi-annual payments, to her two grandchildren. The will then proceeded to bequeath certain personal property to her son, and other personal property to the daughter, and contained a residuary clause leaving all the rest and residue of her property equally to the son and daughter. It will thus be seen that the two acts of Mrs. Moran which are beyond dispute indicate her intention to be that her son Charles was to receive the 1615 Aisquith Street property. She is not here to testify, and if we were to permit testimony as to alleged declarations made by her in respect to the disposition of this property, which are at total variance with the intention expressed by her, both in the deed and in the will, the door

would be always open for an attack upon a deed executed and recorded in accordance with law, after the decease of the party making it.

There may be, and are, instances where courts of equity will grant the relief prayed for here, but to warrant such a decree, the evidence must have every indication of truth and must be of the clearest and most convincing kind. It is true that the deed here conveyed practically all of the mother's property to the son, to the exclusion of the daughter; and while this act may be unusual, and not in accordance with what customarily is done by parents, yet she had the undoubted legal right to do what she did; and because her act may not coincide with what the court would have done, or thinks ought to have been done under the circumstances, it affords no ground for setting aside the deed, for to do so would be to substitute the court's will and purpose in place of that of the grantor. There will always be efforts on the part of disappointed heirs and representatives of deceased persons to strike down instruments by which property is disposed of; and many recent cases in this court indicate a growing tendency on the part of living persons to have the courts strike down their acts evidenced by deeds. Usually these attacks are upon allegations of fraud, mental incapacity, duress, or undue influence; and even in such cases, to enable them to succeed the law requires strict, certain, and positive proof. It needs no argument to show that this should be the rule, because the validity of business transactions depends in no small measure upon the stability of deeds and other solemnly executed written agreements. *Zimmerman v. Hull,* 155 Md. 230, and cases there cited.

The record discloses that the appellee was married in 1898, against the wishes of her mother, some of the witnesses testifying that the marriage was the result of an elopement, which the appellee denies. At any rate, after the marriage she and her husband went to live with her mother at the property in question. Disagreements arising between her mother and the husband, after living there about two years, they left. Some

time subsequently, at the urgent request of the mother, the daughter persuaded her husband to return. They again lived with the mother for a period and then removed to St. Louis, subsequently again returning, and either living with the mother or in a house in the same square; during all of which time, except when away in St. Louis, the daughter looked after and cared for her mother, and did every thing which would be expected of a loving and dutiful daughter. During the time she lived with her mother, she looked after the housework, did much of the cooking and washing, and paid six dollars a week for herself and husband's board. The appellant also lived with his mother, being unmarried, paying twenty dollars a month board and defraying any other necessary expenses; he then, as now, being employed by the Pennsylvania Railroad Company. On the day of the mother's funeral, in 1910, at which time the daughter and her husband were living in the same block on Aisquith Street, according to the daughter's testimony, the brother said to her: "Aren't you coming down to the old home to live? Ma is gone now, and there will be no more trouble with O'Brien"—meaning her husband. "The home is yours. Come down and take it and do as you please." The appellant denies this, and says that what he did tell his sister, in effect, was that she could live at the old home, that the mother was dead, and there would be no more trouble with O'Brien. The fact is that the brother was living there alone, and that about six weeks after the mother's death the daughter and her husband and children moved into 1615 Aisquith Street. At that time, and until the brother married and moved away, he paid his sister ten dollars per month; the arrangement, according to the sister, being that he agreed to pay twenty dollars per month board, but that he would reserve from that amount ten dollars a month and pay the fixed charges on the property, such as ground rent, water rent, taxes and insurance, which amounted to approximately one hundred and twenty dollars a year. The brother's version of the arrangement is that he would allow his sister and family to occupy the property upon paying him rent sufficient to defray the fixed charges, that he would not

require her to pay him the money, but that he would reserve out of the twenty dollars a month board ten dollars for these expenses, and pay her the balance. After the brother left, instead of his paying her ten dollars a month, she paid him ten dollars a month; this for the reason that he was no longer boarding there. According to her version, this ten dollars a month which she then paid him was for the purpose of paying the fixed charges on her own property; whereas, according to him, it was a rent, fixed at that sum so that the property would not be an expense to him. In other words, his version is that he gave his sister the use of the property in consideration of her paying a sum sufficient to meet the fixed charges. It will be seen that either of these versions is consistent with the amount of money paid, first by the brother to the sister while he was living there, and afterwards by the sister to the brother; so that the fact of payment, or the amount thereof, fails to demonstrate the correctness of either version.

This arrangement continued until the latter part of 1923, when a dispute arose between them, growing out of an alleged illegal use of the premises; and in February, 1924, the appellant instituted proceedings and caused a summons in ejectment to be served on the appellee. On April 10th the appellee sent a check for ten dollars to the appellant, upon which there was written, "monthly pro rata expenses on premises known as 1615 Aisquith Street," and checks for like amounts were sent each month, with similar memoranda thereon. These checks, up to December 10th, were returned by the appellant with the notation, "I refuse to accept same with such character of endorsement"; after which they were retained, but not used, by the appellant.

In 1922 the appellant, having been separated from his wife, and an attempt being then made to arrive at his property and income for the purpose of agreeing upon alimony or support money to his wife, there is testimony by the appellee and other witnesses that her brother requested her to testify that the property 1615 Aisquith Street was hers, and that he received no income from it, and also that he made a

similar statement to his attorney in the presence of the appellee's husband. He denies asking her to testify that the house was hers, but says that he did ask her to testify that he received no income therefrom, and this was the statement he made to his attorney. There is direct conflict on this point, and while there are several witnesses on behalf of the appellee, the circumstances attendant upon the alleged declaration tend to support the appellant's testimony. The principal thing being inquired into at the time the alleged statement was made was the income of the appellant, for the purpose of settling the amount of alimony; and it was true that he was receiving no net income from the property, because the ten dollars which his sister was then paying him was consumed in paying the fixed charges. But whether his testimony be true or not, such a declaration on his part, under such circumstances, falls far short of the quality of testimony necessary to strike down a deed. It is not difficult in any case to find circumstances, or perhaps expressions, which, given their broadest application, might be sufficient for an inference as to the capacity in which the property was held; but it is not sufficient to contradict the clear and unambiguous language of the deed. As stated, while the relations existing between the daughter and the mother were of the most cordial and devoted nature, it is also true that the conduct of the son towards his mother was all that such relationship required. He was a considerate and dutiful son, remaining with his mother continuously until her death, attentive to her wants and comfort; and there is testimony of witnesses to the effect that the mother appreciated the son's conduct, saying that he had been "father, son and daughter" since the death of her husband, and that all she had would go to him; so that, even without the deed and will, we would have difficulty in saying beyond doubt that the mother intended the daughter to get the 1615 Aisquith Street property. But when we place in the scale on the brother's side the deed and will, in both of which the mother in solemn form sets forth her intentions in clear and explicit language, we are convinced that the testimony offered on behalf of the appellee is

not sufficient to warrant us in declaring that the brother held the property in question as trustee for his sister.

There seems to be little dispute as to the law applicable to such a case. It has been often declared by this court to be that the burden of proof not only rests upon the appellee, but she must prove her case by clear and satisfactory evidence. *Poole v. Poole,* 129 Md. 387; *Dixon v. Dixon,* 123 Md. 44; *Johns v. Carroll,* 107 Md. 437. In *Dixon v. Dixon,* this court said: "When the plaintiff relies upon mere parol evidence to establish the trust, the court should view with the greatest caution such evidence, impeaching, as it does, a solemn instrument, the evidence of title to land." Therefore the question in each particular case is whether the evidence adduced is sufficient, as measured by the standard fixed by the authorities. In the present case we find that it fails to measure up to that standard, and the decree must be reversed.

*Decree reversed, and bill dismissed, with costs to the appellant.*