ADA BELL QUILLEN ET AL. *v.* EMORY E. BELL ET AL.
[No. 23, January Term, 1930.]

*Decided March 13th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*George H. Myers* and *Franklin Upshur,* for the appellants.

*John W. Staton* and *Godfrey Child,* with whom were *Staton & Whaley* on the brief, for the appellees.

Bond, C. J., delivered the opinion of the Court.

A decree in this case held that land, the title to which was in the name of the defendant, Ada Bell Quillen, was impressed with a resulting trust in favor of heirs of her father, now dead, and she has appealed from that decree. John T. Keas was joined as defendant because of a power of attorney given him by Mrs. Quillen in 1928, and recorded; it gave him power of disposition over the properties concerned, and the decree annulled the power. The question to be decided is entirely one of fact, on testimony taken and documents exhibited. The principles of law have been sufficiently discussed by this court in previous cases. *Moran v. O'Brien,* 156 Md. 221; *Springer v. Springer,* 144 Md. 465; *Dixon v. Dixon,* 123 Md. 44. And see Brantly's note to *Dorsey v. Clarke,* 4 H. & J. 551.

The actual contestants are all children or grandchildren of Emory E. Bell, Sr., late of Worcester County. And the plaintiffs contended, and adduced testimony to show, that he dealt in land for himself, but, because of his wife's unwillingness to sign papers, made a practice of having title taken in the name of a friend, at first, and then of an unmarried child, as his children came of age, and, for protection of his own interest, and to be free to borrow on properties thus bought, took mortgages for the full values in his own name. The defendants deny these main contentions of fact.

The following facts are undisputed. Mr. Bell, Sr., in the 1870's and the 1880's, kept a general store at Berlin, in the county, and was an exceptionally good business man. He sold the store at a time not stated exactly, but apparently before 1889. And he was for a period of years tax collector in the county. He had, in 1879, bought and paid for one piece of the land in controversy, called the Nelson land, and while he owned the store also worked that land. Keas, as a witness for the defense, said, "every day that was good, he was out working on this land he had." The title to that land, however, was put in the name of John R. Purnell. There were several other properties conveyed in 1884 and 1885 to Henry T. Bell, the oldest son of Mr. Bell, Sr., and in 1887

the son executed mortgages for the full values on two tracts. In 1888 another tract was conveyed to Henry, and he gave his father a bond of conveyance on it on the same day. In 1889 Henry T. Bell became insolvent, and made an assignment to trustees, and the land was sold, and bought in the name of John R. Purnell, and Ada E. Bell, subject to the mortgages by Henry T. Bell. Nominal amounts only were paid for the mortgaged tracts, but substantial amounts were paid in deferred payments on the other tracts. Receipts for the nominal purchase money were given, as to two tracts, to the father, Mr. Bell, Sr., and, as to one, to Ada E. Bell. That part of the land so bought which was conveyed to John R. Purnell was later conveyed by Purnell and wife to Ada E. Bell. And simultaneously with the various conveyances to Ada E. Bell, she executed mortgages to her father on the properties not already mortgaged. The Nelson property, which had been bought and paid for by the father in 1879, but conveyed to John R. Purnell, was also conveyed by Purnell and wife to Ada E. Bell in 1889, and the property mortgaged by her to her father. The total of amounts secured by the mortgages was $3,800. Ada E. Bell, then twenty-three years old, was the oldest child next to Henry. It seems impossible to determine with certainty from the record how many farms or lots were transferred to Ada E. Bell, or to determine the total acreage. They seem to have been acquired by Purnell and Henry Bell from nine owners or groups of owners, and in some instances several tracts or lots were conveyed in single deeds. The total of values was estimated by John T. Keas in 1904 at $9,000, and the plaintiff Dr. Emory E. Bell in his testimony valued all the properties together at about $50,000. There seem to be now substantial equities over and above the mortgages. Assignments and reassignments written on the papers show a borrowing by the father on several of the mortgages.

The father, during his lifetime, collected rents from the properties, and paid taxes on them, sold one or more tracts, procuring conveyances from the daughter, and timber was sold from one tract and the money from the sale was applied

to expenses of another child, a son. It is conceded that the properties were used largely for the benefit of the family.

Further undisputed facts are that Ada E. Bell, on the day before her marriage, in February of 1904, conveyed all the properties held by her, except two acres reserved by her from one parcel, to her sister Henrietta, who never married. And in the year 1904, also, the father assigned the mortgages on the properties to his seven living children, in undivided, but unequal shares. Mrs. Quillen testified that she had paid off the mortgages, and they should have been released, but it was after the alleged satisfaction of them that the father, with the knowledge and acquiescence of Mrs. Quillen, assigned them to the children.

Mr. Bell, Sr., died in 1906. In the administration upon his personal estáte the mortgages were not included as part of his assets, and they are still outstanding. The mother of the parties died in 1919. In 1923 Henrietta Bell conveyed by deed to her sister Ada, then a widow, a one-half interest in the properties, and her will, executed in 1920 and probated in 1924, devised all interest of Henrietta to Ada E. Quillen.

Of the disputed testimony much consisted in alleged statements of Mr. Bell, Sr., subsequent to the acquisition of the properties, and we are not permitted to consider any of these except such as may have been uttered in conferences with the defendants. *Dixon v. Dixon,* 123 Md. 44, 63. The plaintiff Dr. Emory E. Bell, a son, testified that in 1889, when he, the witness, was fifteen years old, John R. Purnell, to the witness' knowledge, bought in the properties which had stood in the name of Henry T. Bell, in pursuance of an agreement he had with the father to buy and convey to the father when directed, and that afterwards the father paid Purnell the necessary amounts for those properties and had them conveyed to Ada. And both Dr. Bell and his brother Raymond testified to statements by the sisters, Ada and Henrietta, that the properties belonged to their father, and testified to family conferences in 1904 about the transfer from Ada to Henrietta, and the assignments of the mortgages to the children, at

which conferences the father dictated the actions to be taken, and all children agreed. It was testified that the properties were taken out of Ada's name solely because of her coming marriage, and that the marriage was postponed twice until the transfer could be arranged. After the transfer, papers relating to the properties were kept together in an iron box called by the parties the estate box, and papers of the administration upon the father's estate were kept in it too. Henrietta, Ada, and Dr. Bell all had access to the box when they desired. Some of the exhibits in the case, including a cancelled note, are endorsed with the word "estate" in the handwriting of the daughter Henrietta. Charles F. Matthews, the husband of another daughter, testified to admissions by the daughters Ada and Henrietta that the properties had been put in the names of themselves because of the mother's unwillingness to sign papers. And Mrs. Matthews testified to a request by still another daughter, Mrs. Case, that Mrs. Matthews make a power of attorney so that in case of her death her husband would not bother the children. And there was evidence that the father had made a plat of the Nelson land with the intention that each child should have a building lot on it, and that it was the daughter Ada's building lot that she reserved in making the conveyance to her sister Henrietta in 1904. It was testified that she paid her father $200 for that lot, the father having fixed a price of $100 per acre. The plat was exhibited in evidence, and it bears the names of the children on divisions made on the face of it.

The defendants and their witnesses denied that the father originally bought the properties, or that he ever had the money necessary to do so. They testified that, on the contrary, the daughter Ada bought them all in 1889 and thereafter with funds of her own, derived from a millinery business she was then successfully carrying on. They deny that their mother refused to sign papers, and deny that any family conferences were held on transactions with relation to the properties, or that the defendants ever acknowledged any interest in the father or his other children. While the father

was the one who bid for the properties at the sale in 1889, Mrs. Quillen said that she had him do so for her. She testified, however, that the mortgages she gave her father were to represent his interest in the properties. Mrs. Quillen had little knowledge of details of the acquisition of the properties and dealings in them.

The plaintiffs testified that, upon assigning the mortgages to the children in 1904, the father declared to them that he wished them to use the properties to take care of the mother during the remainder of her life, and to divide among themselves, as they should determine, whatever was left after that time, that it was not feasible to dispose of the properties advantageously afterwards, even up to the present time, and. that the plaintiffs advanced to the sisters who held title, and to the mother, considerable sums of money for support. The sisters deny this, and assert that they advanced money to the brothers. There is a preponderance of evidence to the effect that the brothers did make the advances stated. The plaintiffs testified that it was not until Mrs. Quillen's power of attorney to John T. Keas was recorded that they had any notice of a claim of their sister that the properties were her own.

The trial court stated in an opinion filed that Mrs. Quillen and one sister who testified in her favor, by their manner in testifying, discouraged belief in their statements and created an impression that they were concealing the true facts. Some discrepancies in that testimony appear on the record.

There was one other property mentioned in the testimony, not included among the properties in litigation, which had been bought and paid for by the father in 1899, but title to which was conveyed to the son Emory. It is testified by that son that this transaction was completed without his knowledge, and that the property was conceded to have been his father's notwithstanding the placing of title in the son's name.

We bear in mind the hesitation of courts to contradict titles of record upon parol proof of opposing facts, and the consequent exacting requirements with respect to such proof. The

essential facts must be established clearly, with small possibility of error left. It is established here that the father originally paid for one large tract or group of tracts among the properties involved, called the Nelson land, that notwithstanding payment by him title was put in the name of another, John R. Purnell, and that this land was ultimately transferred to the daughter Ada and a mortgage on it was given by her to her father. As to the other land concerned, there appears to have been a regular course of dealing in which the daughter gave her father mortgages for what stood in her name, for at least a large part of their values, and she acknowledges that the mortgages represented interests of her father. And notwithstanding the daughter appeared of record as owner, the father dealt with the properties in many respects as owner, took the rents, sold portions, or sold timber from portions, and paid taxes. All papers concerning the properties were kept together as papers of an estate. And beyond these established facts, the testimony of the sons that to their knowledge the father paid for all the properties and that the daughters admitted the fact appears honest and is persuasive. The testimony of the sons that the daughter Ada, a young woman in 1889, had no money to purchase land seems plausible. On the whole, we agree with the trial court that a predominance of the evidence is to the effect that the father paid the purchase prices of the properties.

The presumption or inference of a gift, ordinarily drawn from a conveyance to a child of land bought by a parent, is weakened in this instance by the fact that so much was conveyed to one child out of eight living, and it would not, we think, weigh much in the balancing of all the evidence now presented for and against the conclusion that there was a resulting trust. In addition to the testimony for the defendants, however—for what value it may have—facts cited as opposing a resulting trust are that, after the death of the mother in 1919, when all purposes of the trust would have ended, the properties were still left in the name of one daughter, with no request by the present plaintiffs for a division,

for nine years, and that in 1923, when, as the plaintiffs testified, they concluded that Henrietta Bell's health made desirable a change in title, in pursuance of the trust, and accordingly arranged for the reconveyance to Mrs. Quillen, it was only an undivided half interest in the properties that was conveyed. It is somewhat at odds with the plaintiffs' theory that a change, if then decided upon, after the death of both parents, should have been other than a distribution among all the heirs. And if Henrietta Bell's health made it seem at all inexpedient to leave title in her name, it seems out of harmony with the trust contended for, and a purpose to keep title in an unmarried child to facilitate transfers, that one-half of the record title should still be left to the chance of early devolution upon all the heirs of Henrietta Bell. On the other hand, the ideas of the parties with relation to titles in land were in many respects not those of experienced landholders, and it may be unsafe to test their proceedings by the courses which such landholders would probably take.

On such a state of evidence there is room for a difference of opinion, perhaps, but this court has come to the conclusion, on the whole case before it, that the resulting trust contended for has not been satisfactorily established, and that the bill of complaint should be dismissed.

> *Decree reversed and bill of complaint dismissed, with costs to the appellants.*