## FRANK MILTON NICODEMUS *v.* BESSIE WARRINGTON NICODEMUS

[No. 143, 144, October Term, 1945 and No. 6 Adv. October Term, 1946]

660

*Decided July 23, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*Edward L. Ward,* with whom was *H. Courtenay Jenifer* on the brief, for the appellant.

*M. William Adelson,* with whom were *Lester L. Barrett* and *Michael Paul Smith* on the brief, for the appellee.

MARBURY, C. J., delivered the opinion of the Court.

A petition was filed in the Circuit Court for Baltimore County on March 9, 1945, by the appellant, alleging that he and his wife were living apart, that his two daughters, one then 15 and one 11, were away at boarding school, and the younger was shortly to return home for a spring vacation. He asked that the Court assume jurisdiction over the daughters and grant him their temporary and permanent custody. On the strength of this petition, the Court passed an order granting appellant temporary custody, and requiring appellee, his wife, to show cause why he should not have permanent custody. This petition the appellee answered, and subsequently, on May 26, 1945, filed a bill of complaint alleging her marriage on May 5, 1927, the residence of both parties in Baltimore County, and the birth of the two children. The bill then stated that the appellant treated the appellee with great harshness and cruelty, refused to support her and deserted and abandoned her, and that she was without means to support herself and to defray the costs and expenses of the suit. She asked for the care and custody of the children, alimony *pendente lite* and permanent support for the children, and counsel fee. An answer was filed to the bill,

and a hearing held on the question of alimony *pendente lite* and counsel fee. The Court passed an order on July 24, 1945 allowing the wife $35 a week predicated upon the understanding that she and the children should be permitted to live at the family home unmolested by the appellant, who was also to supply them with food and living necessities. A counsel fee of $1,000 was allowed to solicitors for appellee. Thereafter the two cases were consolidated and heard together. A decree was filed on November 6, 1945, directing appellant to pay the appellee $600 a month as permanent alimony and for the support of the two children whose custody was awarded to the appellee. A further fee of $500 was allowed appellee's counsel. From this decree an appeal was taken here and is case No. 143 in this term. Subsequently, after some further proceedings with reference to the payment of alimony pending the appeal, it was ordered that the appellant pay his wife $600 a month as alimony *pendente lite*, and an appeal from that order was entered. This is case No. 144 in this term. On February 21, 1946, appellee filed a petition asking for counsel fee in the matter of the appeals. After a hearing on this petition the appellant was ordered to pay appellee's solicitors $500 for their legal services on appeal. From that order, a third appeal was taken here, which is No. 6, October Term, 1946. This case was advanced so that all the appeals could be heard here at one time.

The basic questions before us are whether there has been a constructive abandonment by the husband, or whether he is guilty of cruelty justifying an award of permanent alimony, and who, under the circumtances, should have the custody of the children. In order to determine these questions it has been necessary to examine a mass of testimony which is largely contradictory. The appendix of appellant contains 565 printed pages, and the appendix of appellee contains 133 printed pages, to which, for the sake of accuracy, may be added 17 printed pages in appellant's appendix in No. 6, advanced, and three

printed pages in appellee's appendix in the same case. The record itself consists of about 1,500 pages.

Mrs. Nicodemus had worked for Mr. Nicodemus for several years prior to their marriage, and was sixteen years younger than he. He is at the present time Vice-President of the Commercial Credit Company, receiving a salary of $20,000. He has been married before and divorced. After they had been married about ten years they moved, with their two children, to a farm in Baltimore County near Monkton, known as Beacon Hill, owned by them as tenants by the entireties, and representing an investment of about $50,000. There had been a number of quarrels prior to that time, and the relations between the parties culminated in the wife finally leaving the house on February 10, 1945. She has not since lived with her husband, although she returned to the house under an agreement, and she and the children still remain there.

The husband's contention that he and not his wife should have the custody of the two daughters is based largely upon what he claims to be the excessive use of alcohol by his wife, particularly during the past three years. He testifies to a number of instances, and produces quite a few witnesses, most of them women who have been guests or hostesses of Mrs. Nicodemus, and whose observations were made while in these capacities. On the other hand, the wife denies any overindulgence, except on one occasion, and her testimony is also supported by a number of witnesses who were present at the times she is accused of having imbibed too freely.

Reversing the picture, the wife offered testimony to show that her husband has been drinking during their entire married life, that he is abusive and profane while under the influence of liquor, that he struck her a number of times, blacked her eyes, had once broken a door down to get at her, and the night before the final separation threatened to break in her room and beat her up, and said that when he had done this, she could get out. She also told of several instances when she had reason to believe him unfaithful, and said that he constantly told her chil-

dren and her mother that she was drunk, when that was not the case.

Among the strongest witnesses for the husband was his sister. On the other hand, the older daughter testified for her mother and the latter is also supported by her sister and by her own mother as well as others.

On the morning when the final separation took place, the wife went to the family physician, and he found her suffering from bromide poisoning. He sent her to the hospital, where she remained a week, and she then went to her mother's home.

Any attempt to summarize the testimony in the record or even to relate the more outstanding episodes in the conduct of these parties, as testified to by the witnesses, would prolong this opinion unduly, and would accomplish no good purpose. We will, therefore, make no attempt to discuss the evidence, although it has all had our careful scrutiny. Only our conclusion will be given.

Clearly, there has been too much drinking, bad language and improper conduct in this household. It may not have harmed the children. One hopeful sign is the statement of the older daughter that she does not approve of drinking. Even if we cannot believe all of the witnesses, there is certainly enough testimony to justify the conclusion that both the husband and wife were too unrestrained in their indulgence. Mere drinking, even excessive drinking, is not a cause for divorce or an excuse for separation, unless such drinking is accompanied by such conduct as to make it necessary for the injured party to leave. We do not find that the conduct of Mrs. Nicodemus was such as to justify her husband in making the numerous accusations about her drinking, which were told to the children and to her mother, and we are unable to find, from the testimony, that he has been, except sporadically, a kind and generous father. As a husband he has been a distinct failure. There are numerous witnesses to cases when he was intoxicated. Their older daughter, who said she respected him for what he had accomplished, but could not love him, testified that she

could always tell when he was drinking, and told how he acted when he was in that condition. His conduct in other respects is not reassuring. The episode at the shore with Helen Vogler, and the Southern Hotel-Oasis Club incident, are such that no reasonable person could be deceived as to their implications. He did not stop, however, with drinking, and sporadic episodes. He apparently instiuted and continued during his married life a course of physical and mental abuse, well calculated to get his wife into the condition, in which she was found when she went to the hospital. The breaking down of the door in Guilford, narrated by his wife, was strangely enough not denied by him, although he put on two witnesses, one of them his sister, and one of them a woman who worked by the day, to testify that the door knob was wrenched off, but that the door was not broken. Mrs. Nicodemus says that his sister was not there, and did not come there, and was talking about some other time entirely. At various times during their married life, this husband struck his wife and on several occasions her eyes were discolored from his blow. He denied this, of course, but there is supporting testimony from other people who saw the results. A particularly brutal incident was the case when, on the return from the Kennedy party, when everyone agreed he was intoxicated and his wife was not, he pulled his wife out of the car in front of her mother's home, threw her on the ground, and said to the aged mother, "Here is your drunken daughter." Another time he called his wife's mother to come to the home to take care of her daughter who was drunk, and said her mother found her there in that condition and slapped her. The mother testified that the daughter was as sober as she was, when she arrived. The Frank Devine episode does not seem to be more than perhaps a momentary attraction felt by Mrs. Nicodemus for a man she met at the seashore, saw twice, and never saw again. The implications about her having breakfast with him in New York are entirely too far fetched to be given credence, and the telephone call to his number would indicate nothing improper if it

were made by Mrs. Nicodemus, although the fact that she showed it to her husband lends some plausibility to the contention that he made it himself in order to have this evidence against her. She is also accused of having stayed late at night or all night with Colonel Helmbold, who was primarily a friend of her husband's, but that idea is so tenuous as not to warrant any further mention. All of these accusations and charges by the husband culminated in his effort, on the night before she left, to break into her room. He gives as an excuse that he wanted to get some iodine because he had had a fall in bringing in his car. But his wife testified there were other bathrooms in the house where he could get the iodine, and, according to her story, he tried to break down the door to beat her up, and said when he got through she could get out and stay out. When he couldn't get through the door, he went somewhere, she thought, to get an ax, as he had done once before, and when she heard him coming back, she was in such fear that she screamed and awakened the servants. Thereupon he desisted. She was so alarmed that she would not come down the next morning unless there was a servant present, and when she did come down she left. There can be no dispute that her condition, when she arrived at the doctor's, was such that she was entirely justified in leaving her home. The bromides she had taken were undoubtedly responsible for some of it, but the conditions under which she lived were also undoubtedly responsible for the bromides.

It is not necessary to determine whether the evidence shows cruelty, as that term has been defined by this Court. *Collins v. Collins,* 184 Md. 655, 42 A. 2d 680. The conduct of the husband was such, in our opinion, as to justify the wife in leaving him under the decisions summarized in the recent case of *Miller v. Miller,* 185 Md. 79, 42 A. 2d 915, and we think there is sufficient corroboration of the wife's testimony in such a case as this, where there is no possibility of collusion. *Schriver v. Schriver,* 184 Md. 227, 44 A. 2d 479. We therefore hold the husband guilty of constructive abandonment.

We have reached this conclusion from the cold record in the case. The chancellor reached the same conclusion after eight days of testimony in which he saw the living witnesses, observed their demeanor, and determined in his own mind which were telling the truth and which were not. His conclusions should not be lightly disregarded. We do not rest our opinion upon them, but if we were in doubt, they would weigh heavily in the scales in a case of this nature. *Meyers v. Murphy*, 181 Md. 98, at Page 104, 28 A. 2d 861.

There was testimony in the case, which we have not narrated, about the efforts of the appellant, after the separation, to effect a reconciliation with his wife, by letters and telephone calls. The expressions of love and devotion in the letters are strangely at variance with the testimony he gave of the kind of woman his wife was and the statements he made about her to his children. It is worthy of note that he wrote these letters in long hand, and carefully made copies of them in his own handwriting. Caution at such a time is not indicative of either affection or sincerity.

The custody of the two girls was given by the chancellor to their mother. This would be the natural decision, unless the mother was found to be an improper person to have them. We do not find that she is. The chancellor allowed $600 a month for alimony and for the support of these two children. It is strenuously urged that this is too much. The appellant puts in his appendix a table showing that from his total salary of $20,000 he has fixed expenses of $11,033, and after deduction of the $7,200 allowed by the chancellor, he will only have $1,766 to live on. This, however, is based upon a federal income tax of $6,246. We do not attempt here to construe the Federal law, but it appears from a cursory examination of the statute that where a wife is separated from her husband on a decree of separate maintenance, payments made under such decree are includible in the gross income of the wife and not includible in the gross income of the husband. Title 26 U. S. C. A. Int. Rev. Code, Secs. 22 (k)

23 (u). The Federal Regulations, interpreting these provisions, state that if the payments are received by the wife for the support and maintenance of herself and the minor children, without any specific deduction of the portion for the support of such children, as in the case at bar, then the whole of such amounts is includible in the income of the wife and the deduction is allowed to the husband. Under these circumstances the appellant will not have to pay income tax on the $7,200 and his income tax instead of being $6,246 would be a small amount over $3,000. As a result, instead of having $1,700 to live on, he would have about $4,700. We have not carefully checked these figures, because such allowances are a matter over which the chancellor has continuing jurisdiction. If the figures given above are not correct, he can change the allowance at any time. If the appellant's figures are correct, it appears that he is paying too much, but if the figures we have stated are approximately the right ones, then the allowance to the wife for herself and the children is not too much, in view of the fact that she will have to pay the income tax on it. *Balland v. Balland*, 185 Md. 132, 43 A. 2d 207. Under these circumstances we will affirm this part of the decree, leaving it to the chancellor to modify it at any time if the conditions should change or the facts are shown to be different.

On the question of counsel fees, we do not think that an allowance of $1,500 for the trial of the case below and $500 for the preparation of the argument and briefs in this Court is excessive. There is some question whether the appeal in No. 144 should not be dismissed, as it is from an order alowing temporary alimony and counsel fee pending this appeal. We do not understand why it was necessary to pass this order, because the original decree allowed the same amounts, and it was within the power of the chancellor to refuse to stay its operation pending appeal. Code Article 5, Section 33. The order expires, however, with this decision. The decree in No. 143 will be affirmed, and we will also affirm the order

appealed from in No. 144 and the order in No. 6 advanced, which allows the counsel fee in this Court.

No questions are before us in these cases with respect to the Monkton Farm, which is held by the parties as tenants by the entireties. In such proceedings as these no disposition can be made of it, nor can any order be passed as to who shall pay for its upkeep, *Roberts v. Roberts,* 160 Md. 513, 154 A. 95. It is evident, however, that some arrangement will have to be made by the parties as to what is to happen to it. Neither, alone, will be able to keep it up, and each one is equally entitled to occupy it. It will probably have to be sold and the proceeds invested for the use of the parties unless they agree otherwise, *Masterman v. Masterman,* 129 Md. 167, 98 A. 537; *Brell v. Brell,* 143 Md. 413, 122 A. 635. We mention this because it is not intended, by affirming these cases, to leave the wife in permanent possession of the farm without giving her husband any rights therein. That is a matter for further agreement or litigation, as the case may be.

> *Decree in No. 143 affirmed with costs. Order in No. 144 affirmed with costs. Order in No. 6, October Term, 1946, affirmed with costs.*