MARGARET H. BRAULT *v.* ALBERT E. BRAULT

[No. 15, October Term, 1947.]

*Decided November 3, 1947.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*John Sumner Wood* for the appellant.

*F. Barnard Welsh,* with whom was *Barnard F. Welsh* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

Albert E. Brault filed his bill of complaint in the Circuit Court for Montgomery County in July, 1946, praying a divorce *a mensa et thoro* from the appellant, custody of three minor children, and other and further relief. The grounds set up in the bill were cruelty and excessively vicious conduct. The answer denied these charges, and there was no cross-bill. After a protracted hearing, the chancellor found the appellant guilty of

cruelty and constructive desertion and that she was an unfit person to have custody of the children. He granted the divorce as prayed and awarded custody of the children to the appellee. From that decree the wife appeals here.

The appellee is 40 years of age and a practicing attorney in Montgomery County and the District of Columbia. During the war he took an active part in Civilian Defense and other patriotic and community enterprises. He served for a time as Trial Magistrate in the county. He belongs to a number of civic, political and social organizations. The appellant is 39 years of age. For some years she has suffered from asthma. The parties were married in 1931, and their three children are aged 14, 13 and 8, respectively. The husband's testimony may be summarized as follows:

Until the year 1943, the domestic life of the parties was serene. In the Spring of that year Mrs. Brault began to be addicted to the use of alcohol. Her inebriety made her quarrelsome and profane, she often neglected her household duties and her children, harangued her husband in the nighttime, and prevented him from getting rest and sleep. On two occasions she called police to the house. Frequently she would turn on the gas in the kitchen at night, in order to annoy him by a pretence at suicide. On one occasion she swallowed (without serious effect) a bottle of sleeping pills that had been prescribed for the husband. In order to obtain rest, the husband, in April, 1945, discontinued marital relations and began to sleep on a davenport in the living-room downstairs. He testified to a number of physical assaults upon him by the wife, in the nighttime, in which she scratched him, tore his pajamas, and threw objects at him, such as books and shoes. He admitted that on such occasions he defended himself, and slapped her on three or four occasions. He testified that he became so apprehensive as to what she might do that he could not sleep, and became thin and nervous. In June, 1945, he consulted Dr. Sullivan, who found nothing organically wrong with him, but prescribed sleeping pills. Again, in Decem-

ber, 1945, he consulted Dr. Sullivan, who found nothing organically wrong, but attributed his nervous condition to his environment. On December 28, 1945, the wife, while intoxicated, threw kitchen garbage on him and told him to get out. He then went to his parents' apartment, five blocks away, where he has resided ever since. However, he telephoned daily to the children to inquire as to the wife's condition, often took them out to dinner, arranged for their schooling, and frequently took the younger children to his parents' apartment to spend the night. He testified that his wife was frequently intoxicated during this period. The chief corroboration of the husband's story came from the 13 year old son. The 14 year old daughter took her mother's part and attributed her mother's conduct more to illness than to drink. However, the witness admitted that on more than one occasion she poured her mother's liquor down the sink. The picture painted by the husband's testimony is that of a woman launched on a course of solitary and escapist drinking that so often leads to chronic alcoholism.

In July, 1946, and again in December, 1946, the wife came to his parents' apartment intoxicated, demanded her children and made violent scenes. On both occasions he called the police. She also complained to the F. B. I. that he had kidnapped her children. On December 14, 1946, he went to her home with his father and found the appellant drunk in bed at 9:30 in the morning. When she arose she fell and became unconscious. He called Dr. Ball who upon arrival, found that the wife had a lacerated lip, and noted that she had bandages on both legs from ankle to knee, on account of an operation for varicose veins. She admitted to him that she had been drinking, and he expressed the opinion that she was drunk. These incidents occurred after the separation, the last incident more than six months after he filed his bill.

Mrs. Brault did not deny that she drank, at times to excess. However, Dr. Donovan, the family physician who attended the children and saw her professionally

on 25 or 30 occasions, testified positively "from my observation, I would say she was not a drunk." He testified that "her physical condition was due in great part to menopause" and that in 1946 she had "some varicose veins and I directed her to Dr. Veal, who performed the surgery." On one occasion in the Fall of 1945, he was called by a Mr. Christopher, at the instance of Mr. Brault. "They said she was drinking heavily * * *. They wanted me to go over so I could be a witness and help to possibly have her committed for observation. * * * She was perfectly coherent, perfectly calm * * *." He told Mr. Brault: "I found her perfectly all right and I don't see how I could possible sign any papers for the commitment."

Mrs. Brault testified that she never drank immoderately until after her father died in the Spring of 1945, and her mother, about six weeks later, was declared mentally incompetent. She denied that her drinking was the cause of the quarrels that began at that time. She attributed them to her husband's behavior in refusing to take her to see her mother after her commitment, his lack of sympathy with her grief, illness and worry, and his late hours and neglect. On one occasion, when he came home in the early morning hours, he told her: "It isn't any of your God damn business when I get in," and kicked her in the stomach. He did not deny this incident categorically, but testified: "I don't recall ever using my feet on Mrs. Brault at any time." It was about this time that the husband began to sleep on the davenport downstairs.

It is stipulated that Mrs. Brault repeatedly urged her husband to return after the separation. She testified that she still loved him and was willing to forego entirely the use of alcohol. He admitted that he had "grown cold" to his wife "after she started drinking heavily and giving me a lot of physical and mental abuse." He also testified that he didn't care to live with her "drunk or sober." Many of the near neighbors were called to corroborate the wife's story. In general, they testified that they had never heard any commotion in the house, had

never seen Mrs. Brault intoxicated, that the home was always neat and clean and the children were not neglected.

Nothing is better settled, under the law of this State, than the principle that "mere drinking, even excessive drinking, is not a cause for divorce or an excuse for separation, unless such drinking is accompanied by such conduct as to make it necessary for the injured party to leave." *Nicodemus v. Nicodemus*, 186 Md. 659, 48 A. 2d 442, 444. Compare *Shutt v. Shutt*, 71 Md. 193, 17 A. 1024, 17 Am. St. Rep. 519. This traditional view is not at variance with the modern opinion that classifies alcoholism as a disease, or as a symptom of mental or emotional disturbance. To justify separation the misconduct of the other spouse must be such as "would render it impossible to continue the matrimonial cohabitation with safety, health, and self-respect." *Hastings v. Hastings*, 147 Md. 177, 127 A. 743, 745. Moreover, "the law of this State is tolerant of nagging, austerity of temper, petulance of manner, rudeness of language, and even sallies of passion, to the extent of not regarding them as of themselves sufficient to justify separation, unless they threaten bodily harm. *Hastings v. Hastings* [supra]." *Hockman v. Hockman*, 184 Md. 473, 479, 41 A. 2d. 510, 513.

The Chancellor took the view that the wife's conduct was such as to justify the husband's departure, citing the cases of *Kruse v. Kruse*, 179 Md. 657, 22 A. 2d 475, and *Robertson v. Robertson*, 187 Md. 560, 51 A. 2d 73. We think, however, that these cases are distinguishable on the facts. Even if we accept Mr. Brault's testimony at its face value, we do not find that he was put in fear by his wife's conduct, or that his life or health were seriously endangered. If he believed that his wife was dangerously irresponsible, it is difficult to justify his allowing the children to remain with her for more than six months before he began proceedings. We cannot doubt that he was embarrassed and annoyed, but under the authorities this is not enough either to establish legal cruelty, or to justify a separation on the somewhat

broader ground of constructive desertion. See *Ritz v. Ritz,* 188 Md. 336, 52 A. 2d 729, distinguishing *Kruse v. Kruse, supra.* He testified that one reason for his leaving was in order to "see if her manner of living would change." But he rebuffed her subsequent offers of reconciliation. As was said in *Hastings v. Hastings, supra,* 147 Md. 183, 127 A. 745: "When the break came it was final, peremptory, and unconditional, and there was no encouragement to repentance held out." It was his duty to become reconciled, if the offer of the other party was sincere and unconditional. *Zukerberg v. Zukerberg,* 188 Md. 428, 53 A. 2d 20, 22. More patience and intelligent understanding on the husband's part might have prevented the matrimonial wreck with its serious consequences to those innocent bystanders, the children.

As in every case involving a broken home, the question of custody presents a difficult problem. We are impressed with the solicitude shown by the husband for their welfare, and we are not disposed to disapprove the arrangements that have been made for the younger children to attend boarding schools. The oldest girl definitely desires to remain with her mother, and we see nothing to indicate that the association has been harmful to her up to this point. In fact, weighing the testimony of the disinterested witnesses, we think the custody of all three children may safely be entrusted to Mrs. Brault, with proper provision for access by and visits to Mr. Brault at suitable times, subject to the continuing jurisdiction of the chancellor, who, of course, has complete authority to pass such orders as may be necessary to provide support for the children, or to change the custody if conditions require it. Code, Art. 16, sec. 41. As the marital status of the parties remains unchanged, there can be no award of alimony (as distinguished from alimony *pendente lite*), but the appellee will, of course, remain under the general duty to support the appellant.

*Decree reversed and case remanded, with costs.*