SHIVES ET AL. *v.* BORGMAN

[No 30, October Term, 1949.]

30

*Decided December 7, 1949.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*T. Aubrey Kemp,* with whom was *Martin V. B. Bostetter* on the brief, for the appellants.

*John A. Latimer, Jr.,* and *Evan McC. Crossley* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

This suit was brought in the Circuit Court for Washington County to specifically enforce an oral contract. Complainant, Mrs. Elizabeth P. Borgman, alleged that she entered into the contract with Charles S. Shives, deceased, who agreed to make a will leaving her his entire estate.

Decedent died intestate on December 18, 1947, leaving personal property valued at $280 and three lots of ground in Fairview Addition to Hancock improved by a five-room house, a tenant house and a barn. He was survived by one brother, James W. Shives, who has been appointed administrator of the estate, one sister, and a number of nephews and nieces. The decree, from which appeal was taken by the administrator and all other heirs at law, declares that decedent and complainant entered into a valid and enforceable contract by which decedent agreed to will his entire estate to complainant, orders the administrator to distribute the personal estate to her, and appoints a trustee to convey the real estate to her.

There is no question of the legal right of an owner of property to enter into a contract to execute a will leaving the property to the other contracting party. *Wilks v. Burns,* 60 Md. 64, 70; *Scott v. Marden,* 153 Md. 1, 12, 137 A. 518. It is also well established that a court of equity will specifically enforce an oral agreement to devise real estate, although the agreement is within the Statute of Frauds, where the promisee has fully performed his part of the agreement by rendering services whose value cannot be estimated in terms of money, and a monetary award will not place the parties *in statu quo* or adequately compensate the promisee. In such a case the court assumes jurisdiction to prevent an injury amounting to fraud and enforces the agreement by the imposition of a constructive trust. *Fitzpatrick v. Michael,* 177 Md. 248, 255, 9 A. 2d 639; *Mannix v. Baumgardner,* 184 Md. 600, 42 A. 2d 124.

The contention of defendants is that the evidence in this case was not sufficient to justify a decree of specific performance. We cannot agree with their contention. Of course, complainant herself was prevented from testifying as to the alleged contract because her testimony as to any transaction with decedent was inadmissable under the evidence statute. Code 1939, art. 35, sec. 3; *Giering v. Sauer*, 120 Md. 295, 297, 87 A. 774; *Snyder v. Cearfoss*, 187 Md. 635, 641, 51 A. 2d 264. However, she produced a number of witnesses who testified definitely as to the terms of the contract. Complainant's husband, Eugene T. Borgman, a retired railroad man, gave a detailed account of the events leading up to the final agreement. In 1931 decedent, who was unmarried and living alone, engaged complainant, then residing in Cumberland, to come to Hancock to work as his housekeeper. She brought along her 4-year-old son, Robert Lodston, and stayed at decedent's home until her marriage in August, 1935, when she went to California. Her son, however, remained in Hancock until he entered the United States Navy.

In 1936 complainant returned to Maryland and thereafter she visited decedent frequently. On these visits decedent repeatedly offered to leave his estate to her if she would come back as his housekeeper. In July, 1936, she did return and she worked for decedent until March, 1938, when she went back to Cumberland.

From 1938 to 1944, decedent did the household work himself as best he could. During that period complainant often came from Cumberland and helped to clean decedent's house. In the fall of 1944 decedent became ill. Some of his neighbors then came to his aid. One of these, Mrs. Bertha Clay, who lived in the tenant house, testified that she cooked, washed clothes and cleaned house for him, and that she was paid for her services.

In 1945, when decedent was about 53 years old, one of his legs was amputated, and when he returned to his home he used a wheel chair and crutches. From then on his need for a housekeeper was extremely urgent. In

February, 1946, he appealed again to complainant. Her husband testified that throughout an afternoon and evening in that month the subject was thoroughly discussed, and that he heard decedent make the following promise: "I will see you get my personal property and real estate. * * * I will see you get everything I own."

When complainant's son was discharged from the Navy in July, 1946, and went to Hancock, he was immediately urged by decedent to persuade his mother to come back to her old employment. The young man took the message to Cumberland, and on August 28, 1946, his mother and her husband appeared. They found the disabled man, who had not yet received his artificial leg, in a weak and nervous condition. His only companions in the house were dogs and cats. Again, according to complainant's husband, decedent renewed his promise to complainant: "If you will stay and take care of me, then if anything should happen to me, I will see that you will get everything I own, real estate and personal property." Complainant's son likewise testified that he heard decedent make the promise on that day.

Complainant finally accepted the offer, and her husband testified that he gave up a job which he had at that time in a Cumberland bakery, to come with his wife to Hancock. He further testified that after they arrived in August, 1946, it took two weeks "to go over the entire house to clean it up." There seems to be no doubt that complainant fully performed her part of the contract. She cooked three meals a day, scrubbed the floors, washed decedent's clothes, bathed him and waited on him when he was sick in bed. For these services she was never paid anything. Her husband took care of decedent's horses, raised corn, sold wood, wired the tenant house, and did other work on the premises, but was never paid anything for any of his services.

The testimony as to the contract was corroborated by Mrs. Mary M. Borgman, complainant's mother-in-law, who swore that she heard decedent declare that he intended to leave complainant everything he owned if she

continued to work for him until he died. Further corroboration was supplied by Edward P. Fost, a 60-year-old painter and decorator, who swore that when he offered to purchase the property in question from decedent in the latter part of 1946, he rejected the offer with the explanation: "I have everything fixed for Lizzie and the boy."

We recognize that a court of equity should never be anxious to save an oral contract, especially a contract of this particular kind, from the operation of the Statute of Frauds where there is any equivocation or uncertainty in the evidence. The terms of the contract must be clear and definite and must be affirmatively established by strong and convincing evidence. The acts performed by the complainant should also be clear and definite and solely with a view to the performance of the alleged contract. The acts performed must be of a substantial nature and must be such that the complainant would suffer injury amounting to a fraud as a result of the promisor's failure to carry out the agreement. *Semmes v. Worthington,* 38 Md. 298, 327; *Neal v. Hamilton,* 159 Md. 447, 150 A. 867; *Evans v. Buchanan,* 183 Md. 463, 471, 38 A. 2d 81; *Weaver v. King,* 184 Md. 283, 40 A. 2d 511. However, in all appeals in equity, the chancellor's findings of fact, based upon evidence taken in open court, will be sustained unless the Court of Appeals is convinced that such findings are clearly unwarranted by the evidence in the record. *Moran v. O'Brien,* 156 Md. 221, 144 A. 257; *Nicodemus v. Nicodemus,* 186 Md. 659, 48 A. 2d 442; *Lickle v. Lickle,* 188 Md. 403, 52 A. 2d 910.

Finding the terms of the oral contract clear and definite and affirmatively established by strong and convincing evidence, we must affirm the decree of the chancellor.

*Decree affirmed, the costs to be paid by appellants individually.*