ROMAINE FISCHER *v.* WILLIAM C. FISCHER

[No. 17, October Term, 1943.]

*Decided November 4, 1943.*

The cause was argued before SLOAN, C. J., DELA-PLAINE, COLLINS, MARBURY, GRASON, MELVIN, ADAMS, and BAILEY, JJ.

*George M. Brady* for the appellant.

*Harry B. Wolf, Jr.*, with whom was *Harry B. Wolf* on the brief, for the appellee.

MARBURY, J., delivered the opinion of the Court.

This is a bill for divorce *a mensa* by a wife, alleging cruelty, excessively vicious conduct and abandonment. Testimony was taken in open court, and at its conclusion a decree was signed, denying the divorce, but assuming jurisdiction to protect the rights of the infant child, now a little over four years old. The child was awarded to the wife with the usual privilege of seeing it at reasonable times given to the husband, and the husband was directed to pay the sum of $15 a week for support of the child. From this decree the complainant appeals.

It may be stated at the outset that there is no evidence in the record of excessively vicious conduct or cruelty of treatment in any physical sense. The husband is shown to be a man interested in various business affairs, not spending a great deal of time with his wife, but the testimony does not show that his conduct towards her was in any respect improper, or that he ever engaged in any acts of physical cruelty towards her. The third ground, namely, abandonment and desertion, is the one, therefore, upon which the case rests. Inasmuch as the wife left the husband, the abandonment charged is constructive. In order to entitle the wife to a divorce, it must appear from the evidence that she had sufficient cause to leave her husband. His conduct may give such cause, even though it may not amount to cruelty. *Kruse v. Kruse*, 179 Md. 657, 22 A. 2d 475.

The parties were married in February, 1938. The husband was forty years old at the time of the taking

of testimony and the wife was twenty-five. He had been married before. She had not. He had known her fifteen to eighteen years, according to his testimony, and according to hers, practically all her life. He had been visiting her four years before they were married. At the time of the marriage the husband was living with his mother, who was a widow, at 1186 Nanticoke Street in the City of Baltimore. It was a double house with a saloon downstairs, and there were approximately six rooms upstairs with a hall running through. The family kitchen was downstairs, and there was one bathroom upstairs. To this home the defendant tooks his wife after they were married, but she was never given a place at the head of the household. The husband's mother had charge of running the establishment, did the purchasing for the family meals, and did all the cooking. She continued doing just as she had done prior to the marriage. The only difference was that the wife and husband occupied one room, and after the arrival of the baby, a second room, of which the wife had charge. There is much in the record about the presence of roaches and other disagreeable insects in the house, but it is unnecessary to discuss that phase of the case. If the wife had charge of the home, the responsibility of keeping it free from pests of this nature would rest upon her. The question is not whether the home was properly kept. It is rather who was put in charge of it, and of this there seems to be no question. The mother of the husband continued to manage it just as she had always done, the food was of her choice, and the kind that she had always had, and the wife was to all intents and purposes, a boarder.

The wife testified that she knew that when she was married she was to be taken to the house on Nanticoke Street, and that she was satisfied to go at the time. She stated that she knew from the beginning that her mother-in-law objected to her entirely, so she wanted a home of her own, and she started right in to plead for one. After the baby came there was some dispute with

the mother-in-law about correcting him, and the wife asked the mother-in-law to leave him alone, and for the past two years the wife and mother-in-law did not speak, or at least only spoke when it was absolutely necessary. The wife testified that she only cooked for the baby, that she did not help her mother-in-law in the kitchen, because the latter would not let her. "That was her own home," and the wife said that she had practically nothing to do with anything, that she was practically a maid, and neither her mother-in-law or her husband would let her have anything to do. On one occasion the wife asked her husband to please take her out of the place, that she couldn't stand it any longer under those conditions, and that she would be satisfied if he would just take two rooms for them. He refused and she then said that she was going to do something about it. The husband replied, "Well, go ahead and go." The wife said that, "She would if it weren't for the baby," and the husband said, "Don't worry about the baby, I will give you three dollars a week for him." The wife the next morning sent for her mother, but the latter persuaded her not to leave. The husband gave as his reason for refusing that his business was there and he couldn't leave. It is a little difficult to understand just what he meant by this, because, while he owned the property and rented it to the man who kept the saloon, both he and the man who kept the saloon denied that he had any interest in the place of business. It appears, however, that all of the bills of the place of business were paid by his check, that he went there every Sunday morning and kept bar, that he had an interest in some pin-ball machines which were formerly in the place, and that he bought some more for the saloon-keeper, although this was explained as being a loan. It was also shown that on Friday evenings the husband did a considerable business in cashing checks for people coming into the saloon, the record showing that he made about $30 an evening, and he himself saying that the check business was very promising. The husband also

owned some other properties, was the head of a finance company which loaned money on automobiles, and did some personal financing on his own. It was admitted by his counsel that his yearly income was $6,544. His bank account, which was put in evidence, shows that during the period of several months, he had at times very large sums in bank, sometimes amounting to $19,000, and frequently running in excess of $10.000. He was amply able to support his mother and to provide a separate home for her, or to get another home for his wife, and in fact admitted that he could. In his testimony he said that he was prepared to offer his wife an independent home away from his mother, if she would come back, although he did not deny that he had refused some two or three months before she left. He told the court that when his wife was talking to him about it, that then things were so high, and on account of the draft situation (although he was over thirty-eight years old), he didn't think it was the proper thing to buy anything, and that apartments and homes were high and hard to find. He did not, however, testify that he had made any effort whatever to find a separate place, and it is apparent that he did not intend to. He brought his wife home to live in his mother's home, and expected that she and he would live there together under the same conditions that he had lived previously with his mother running the house, doing the cooking, and his wife simply being an added member of the household without any authority over it.

The husband's mother testified. She admitted that they all had a common place where they ate, that she did the housekeeping and the cooking, and that two years prior to the hearing, her daughter-in-law told her she did not want her to have anything to do with the baby because of some candy she was giving him, and from that time she didn't say much to her daughter-in-law and her daughter-in-law didn't say much to her. She did not testify at all either way concerning the desire of her daughter-in-law for a separate home. The

husband admitted that the wife protested to him about living with his mother, and when asked what was the complaint, said that the protest was against his mother and the neighborhood, and the main thing was the neighborhood.

The testimony of the husband himself is sufficient corroboration of the wife's, although there is the additional testimony of the wife's mother, who went to see the husband after the time he had told his wife to go, and asked him if he meant it. As the result of this conversation, she persuaded the wife to stay longer. The husband did not make any attempt to get his wife back after she left, and went to her mother's home, although he said at the trial that he wanted her back. He appeared to have been kind to her in his way. She made no complaint about the amount of money he gave her. He occasionally gave her presents, one being an expensive wrist watch, and also a ring. She had entire freedom of going out at all times, and did in the last part of her married life spend every evening with her baby at her mother's. She seems to have been well enough treated as far as her station in life was concerned, and was denied only the one thing that she craved, namely, a home of her own which she could run according to her own wishes.

The general effect of the decisions throughout this country is that the duty of a husband to provide a home for his wife not only extends to the furnishing of material comforts in accordance with his means, but also the home must be where the wife is free from unwarranted interference from members of the household. If such a home is not provided, the wife is justified in leaving, and not only is not guilty of desertion, if she does, but she may charge her husband with constructive desertion of her. A wife is entitled to a home which is under her control, and is justified in leaving if the husband permits his mother or other of his relatives to dominate the household, or if he insists on her living with relatives with whom her relations are unpleasant.

These statements are not absolute, and no rule of general application can be formulated, each case being based largely on its own circumstances. The power of determining where the home shall be and who shall be its inmates rest primarily in the husband in correlation to his duty to make provision for his wife, but this right must be exercised in a reasonable manner, and he cannot arbitrarily compel his wife to live with his relatives. 17 *Am. Jur., Divorce and Separation,* paragraph 104 pages 103-104.

The decisions in this court follow the same lines of reasoning. In one of the earlier cases, the wife, who was a widow, married a widower, who had several children, two unmarried daughters living in the house with him. He told her before they were married that he would not give up his daughters. Notwithstanding this, she went to live in his house. The court found that in this delicate situation, the wife contributed by her own attitude to the difficulties with the daughters, which were related in the evidence, and that she was not justified in leaving. *Buckner v. Buckner,* 118 Md. 101, 84 A. 471. But in another case, where the parties went to live at the home of the husband's parents, and stayed there for a little over a year, after which the wife left, the question was whether her husband was entitled to a divorce *a mensa,* because of her desertion. The court found that the conditions and surroundings of the parents of the husband were uncongenial, and caused the wife much unhappiness, and the only reason that she left was because the husband failed to provide her with a separate home which he promised to do and was able to do. The husband's bill was therefore dismissed. *Young v. Young,* 136 Md. 84, 110 A. 207.

In the next case where the question arose, the parties after marriage went to live with the husband's parents, remained there about two months, then leased an apartment for four months, and then the husband insisted that they go back to his parents' home, that that was the home he would provide for his wife, and

it was up to him, and that his wife had nothing to say about it. The court said that the direct question presented itself, when a husband is financially able, does the law impose upon him the obligation of providing an independent home for himself and his wife, and does the failure so to do justify the wife in refusing to live with him in the home of his parents? In deciding that, in the case before it, the wife was justified, in affirming the decree given her by the lower court, this court said: "One of the strong incentives for marriage is the prospect and expectation by the newly married parties of establishing an independent home in which the husband and wife, each in their proper sphere, are supreme. This instinctive desire of home building should be encouraged and fostered, as upon the foundation of independent and happy homes the stability and prosperity of a nation largely depends." *Hoffhines v. Hoffhines,* 146 Md. 350, at pages 358 and 359, 126 A. 112, at page 115, 38 A. L. R. 332.

A later case was one where a husband brought to his home a brother who was a mental deficient, and at times dangerous, and the wife left. The court said not only would the wife have the right to refuse to live with her husband under such circumstances, but that such conduct, if persisted in, would constitute cruelty. The court, however, did not believe that that was the real reason of her leaving, and for that reason reversed the decree given the wife in the lower court. This case was brought by the wife on the grounds of cruelty, and the cross-bill was filed by the husband on the grounds of desertion. It is not strictly in point, but is cited because there is considerable discussion of the respective rights of husbands and wives in circumstances where the husband has the added responsibility of caring for his relatives. *Crouch v. Crouch,* 150 Md. 608, 133 A. 725.

A case which the appellee urges upon us as authority for the dismissal of the wife's bill is the case of *Ewing v. Ewing,* 154 Md. 84, 140 A. 37. In that case the hus-

band was granted a divorce from the wife on the grounds of desertion. The facts, however, showed that his parents were over seventy years of age, and the son was their sole support. His salary was fifty dollars a week, and he was unable to provide another home for his wife. This court said that the difficulties which the wife had in the home were trivial, and did not justify her in declining to live in the home, which she knew about before she was married. In so deciding, however, the court set out the fact that it had been recognized by this court that there were grave difficulties in the way of a wife's living in a home maintained by her husband's relatives, which might justify her in leaving, and that the husband might be guilty of desertion if, in that situation, he provided no other home for his wife where it was practical for him to do so.

In another case a widow married a widower shortly after the death of his first wife, and he and his children, and she and her children, went to live at the home of the wife, and there they had their only child. The court said that, as might have been expected, the compulsory association of the members of these ill assorted families was neither happy nor harmonious. Finally the wife asked the husband to take his children away, which he did, but he finally left himself after about two years, and went to live with his children. He claimed that he offered to continue to live with her, if she would come and live with him in the house that he owned. The court did not believe that he ever, in good faith, made this offer, and stated that if he did, it was conceded that it was probable he would have endeavored to keep his daughters there also. The court granted her a divorce, and said that whether her refusal to occupy his home with him under the circumstances just outlined would have been justified need not be considered in the view it took of the case. *Schwartz v. Schwartz,* 158 Md. 80, 148 A. 259.

The case of *McClees v. McClees,* 160 Md. 115, 152 A. 901, was another case where a widower with children

married a woman of forty-two years of age, who had been married twice before, and had each time obtained a divorce. Before they were married she was made aware of the fact that she was expected to occupy her new husband's home where his children were living with their grandmother, the mother of the husband. The home was large and commodious, and several servants were employed to look after it. The wife was given complete charge, and ample funds for the conduct of the house were turned over to her. The parties only lived together for a year, and apparently had violent quarrels and physical encounters. The wife left, and the court found that the presence of the children and the mother-in-law in the home under those circumstances did not constitute constructive desertion, and refused to give the wife a divorce.

In the case of *Kirkwood v. Kirkwood*, 165 Md. 547, 170 A. 180, the wife sued on the grounds of constructive desertion. In that case the parties, when married, went to live with the husband's parents. For the first three years, the father was living. He then died, and for ten years more, the mother, the husband and wife, continued to live together. The mother was seventy-five years of age and owned the property. The husband earned a small weekly wage and could not provide his wife with another home. It was by the united effort of all three that the home was maintained. The court said that the evidence did not establish that the mother-in-law's presence in any degree hampered the happiness and tranquility of their domestic life, and dismissed the wife's bill.

A late case dealing directly with the subject was decided by this court in 1937. In that case the husband brought into the home his mother and sister. The mother had no other place to live, was advanced in years, and without property, and the husband stated that he could not turn her out of his home, and could not provide for her outside. This court said that it was convinced from a careful reading of the testimony that the husband's

mother had not been uncongenial to the appellant, and reiterated the general principle that each case has to be controlled by its own particular facts. It was stated that so long as the presence of the husband's relatives in the home places the wife under no restraint, "but leaves her as mistress of the domicile, * * * this does not constitute abandonment and desertion, unless [the husband] is financially in position to provide a separate home for such [dependent] relatives." *Foeller v. Foeller*, 171 Md. 660, 190 A. 221, 224.

The latest case decided by this court on the question of living with relatives was the case of a wife, who, when married, was a widow with a married daughter. Her daughter and an aunt of the wife lived with the parties during a period of about ten years. The wife was running a fruit business, and the husband was at times working for her, and at times out of employment. Finally the daughter and the wife's aunt moved to another location, and the husband proposed that he and his wife go to quarters where they could live by themselves. The wife chose the daughter's abode in preference to the husband's. This court, speaking through Judge Sloan, said that on these facts the wife had surrendered any claim of abandonment she might have, and denied her a divorce. *Lorea v. Lorea*, 181 Md. 666, 30 A. 2d 73.

At the risk of unduly lengthening this opinion, we have reviewed the above ten cases, all pertinent to the decision of this case. Each case is different in its facts, but the principle running through all of them is the same. It is that the wife is in general entitled to a separate home, or at least one in which she is the mistress and has the control. If circumstances make it necessary for her to live in the home of her husband, and she is aware of this when she is married, she cannot complain of it, if her husband is unable to provide for her elsewhere, but if he can, he must do so. The right to a separate home under ordinary circumstances is the right upon which a wife is entitled to insist.

In the case before us, no attempt whatever has been made by the husband to provide such a home, although he is amply able to do so. It seems to be his desire to remain where he has been all his life, in the home run by his mother, and he treats the wife's complaints about it and her distaste for it as if they were unjustified complaints of a child, who has no rights at all. His belated statement at the trial that he was prepared to offer his wife a separate home means nothing, in view of his previous actions. What he suggests now, after the case has been brought, after the separation has occurred, and the case is being heard, comes too late to prevent an adverse decision of the court. We think that the wife was justified under the circumstances of this case in leaving her husband, that the conditions under which she was forced to live constitute grounds for such leaving, that the separation was a desertion of her by her husband rather than a desertion of him by her, and that she is entitled to a decree of divorce *a mensa et thoro* with such allowance of alimony as may be proper in view of the circumstances of the parties. She is also entitled to the custody of the infant child of the parties, with such access to the husband as may be reasonable. The decree will be reversed, and the case will be remanded for the passage of a decree in accordance with the views expressed herein.

*Decree reversed, case remanded with costs to the appellant.*