GEORGE S. ROBERTSON, JR. *v.* MABEL J. ROBERTSON

[No. 52, October Term, 1946.]

*Decided February 6, 1497.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Leonard Weinberg* and *George L. Clarke,* with whom
were *Weinberg and Green* and *George W. White, Jr.,*
on the brief, for the appellant.

*John A. Cochran with* whom was *Roland C. Ready* on
the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decree of the Circuit Court of
Baltimore City granting a divorce, *a mensa et thoro,* to
a wife, and awarding her the custody of the nine-year-
old son of the parties. The decree also dismissed the
husband's cross-bill and awarded alimony and counsel
fees. The appellant contends that the evidence did not
establish legal cruelty, and that he was entitled to a
decree on the theory that the wife left him without
sufficient cause.

The parties were married in 1934, and their son was
born in 1936. Apparently their life was free from
serious discord until July, 1944, when the appellee testi-
fied that they had a quarrel over a letter he received
from another woman, and he choked the appellee in
order to force her to surrender the letter. The incident
was not corroborated, and it is admitted that their rela-
tionship became normal thereafter.

On Christmas eve, 1944, the appellant made a scene
in his father's house over the presence there of a mar-
ried man who, he claimed, was attentive to his sister.
The appellant chased him out of the house, tore tele-
phones out of the wall, and was only induced to leave
when the police arrived. When he reached home, he pro-
duced a .45 automatic, and after threatening to go out
and kill the alleged suitor of his sister, fired two shots
into his own fireplace or mantel, in the presence of his
son and guests. After unsuccessfully trying to locate
the man by telephone, he finally subsided. This whole
incident was fully corroborated by other witnesses.

In April, 1945, the appelle's father died and the Robertsons went to Georgia to attend the funeral. The appellee remained with her mother until May 8th. Upon her return home, she met with a cool reception. A few days later a Mrs. S., a neighbor, came to dinner, and later they went to a tavern. There Robertson quarreled with the appellee and asked her how much she would take to return to Georgia and leave their son with him.

On May 15th, Mrs. S. again dined with the Robertsons, and later the trio went to the Belvedere. There Robertson asked his wife if she would consent to Mrs. S. becoming his mistress. She refused, and expressed her desire to go home. Robertson's behavior in the hotel was so disorderly that he was threatened with arrest or eviction by the house detective. After taking his wife home, he escorted Mrs. S. to her residence, where he remained for about 40 minutes. When he returned he again proposd that the appellee consent to Mrs. S. becoming his mistress.

On May 19, 1945, the appellee threatened to talk to the husband of Mrs. S. "if the things did not stop." Appellant asked her to go for a ride in his automobile, to talk things over. In the course of the ride he made threats to drive the car into a quarry-hole, or to take their son and leave her, if she spoke to Mr. S. She finally agreed to remain silent, but he kept seeing Mrs. S. and relations between the parties were very strained. Later in the year, while at their summer home, the appellee testified that Robertson confessed to her that he had committed adultery with Mrs. S., but "we agreed we would try to forget it."

On January 6, 1946, after a late party, the appellee testified that Robertson slapped her, demanded that she produce his automatic, which she had hidden, and when she refused, said: "all right, then, I have a shotgun in here." During this period Robertson seldom came home to dinner, but would come home at all hours of the night. He also cut off her allowance of spending money. On February 4th, Robertson told her he wanted his free-

dom, and had selected a lawyer for her to see. She replied that she would select her own lawyer. A few days later he announced before guests that the "partnership of Robertson and Robertson" was going to be dissolved and that he "was going to get [a divorce] on the ground of adultery, or else." He also implied that he expected to remarry. This incident was corroborated by one of the guests, who made it clear that the remarks were not made facetiously. Marital relations ceased shortly thereafter. On March 14th the parties had a conference at her lawyer's office. Robertson demanded a "thirty-day divorce" and custody of the child, and was "very angry because I had not accepted and agreed to the terms that he had set forth." That night she testified that her husband pulled her hair, beat and kicked her, and told her she could no longer consider herself as his wife, that she was only a glorified housekeeper. The next day her brother and sister-in-law arrived from Georgia for a visit. When they left on the 22nd she accompanied them. On March 19th, at the husband's instance, the son was entered as a boarder in McDonogh School, to which she agreed, but stated she would return home for the boy's Easter vacation. While in Georgia she wrote her husband a rather sentimental letter, to which he did not reply.

The appellee returned on April 18th, 1946. The appellant did not speak to her, except to say "good afternoon", until the next evening after he had taken the boy to choir practice. He then said: "I purposely did not come home until this time because I had no desire to have any conversation with you at all, but there is one thing that I would like to say, that if you so much as by one word, by one act, even the change of expression on your face, or the flick of an eyelash, indicate to George while he is home these four days that there is anything wrong between you and I [sic], I will kill you." When she denied any intention of upsetting the child, he said: "and furthermore, I shall expect to have a thorough accounting of you after I have taken George back to McDonogh on Monday night." When her husband left with the boy on Monday, April 22nd, she did not remain for the

"accounting," but took up her quarters elsewhere. She filed her bill on April 24th; the answer and cross-bill were filed on May 9th.

About three weeks after the appellee left, she joined her husband and son at the Preakness and had dinner with them. On May 12, 1946, they all went to the movies and dined together, and on June 2, 1946, they all went to Chapel at McDonogh School and the appellant drove her back to town and took her to dinner at a restaurant. She testified: "he took me home because * * * he wanted to try to persuade me to drop my charges, or see if we could not get together." He drove her to the place she was living around 12 o'clock. She testified she was not afraid that he would harm her on that occasion, in a public place or on well-lighted streets. The appellant stresses this incident as indicative that she was in no real fear of injury by the appellant.

The financial situation of the parties was that prior to 1943 Robertson earned from $3,000 to $6,000 a year working for a life insurance company. In 1942 he went into a wood-working business for himself, and in 1943 his income, before taxes was about $13,000. In 1945, his income was about $26,000, before taxes, although this was said to be an exceptional year. The appellee has no income of her own, but received about $7,000 from her father's estate in 1945.

In the face of the appellee's testimony, the appellant did not take the stand to deny her charges in any particular, although there was a general denial in his answer. He produced no witnesses, except his son, and this was for the sole purpose of rebutting the wife's statement that the child had been chastised by him in a cruel manner, and showing that the child was happy at McDonogh and not ill-disposed towards his father. The appellant's whole defense is based on the contention that the evidence does not support the wife's charge of cruelty, and in any event, that there was a want of sufficient corroboration.

It is well established by the decisions of this Court that acts which may not constitute legal cruelty in them-

selves, may nevertheless justify the injured spouse in leaving the marital domicile and entitle the injured party to a divorce *a mensa* on the ground of constructive desertion. *Nicodemus v. Nicodemus,* 186 Md. 659, 48 A. 2d 442; *Miller v. Miller,* 185 Md. 79, 42 A. 2d 915; *Collins v. Collins,* 184 Md. 655, 42 A. 2d 680; *Fischer v. Fischer,* 182 Md. 281, 34 A. 2d 455; *Kruse v. Kruse,* 179 Md. 657, 22 A. 2d 475. Unfounded accusations of infidelity may in themselves constitute cruelty. *Poole v. Poole,* 176 Md. 696, 6 A. 2d 243; *Silverberg v. Silverberg,* 148 Md. 682, 130 A. 325. Previous acts of cruelty or other misconduct, although condoned, may be revived by subsequent misconduct. *Sensabaugh v. Sensabaugh,* 186 Md. 348, 46 A. 2d 635; *Hilbert v. Hilbert,* 168 Md. 364, 177 A. 914, 98 A.L.R. 1347.

In the case at bar the wife's story portrays a course of conduct by the husband designed to humiliate and degrade her, and his repeated threats were well calculated to put her in fear, in the light of his reckless and violent disposition. We think the wife's story was sufficiently corroborated. Where there is no danger of collusion, only slight corroboration is required. *Kelsey v. Kelsey,* 186 Md. 324, 46 A. 2d 627; *Jones v. Jones,* 186 Md. 312, 46 A. 2d 617; and *Bowersox v. Bowersox,* 157 Md. 476, 146 A. 266, 65 A.L.R. 165. While the violence displayed in the pistol incident was not directed towards the wife, it was revealing as to his disposition, and the statements of his intentions and veiled accusations of infidelity, made in the presence of guests, were indicative of his desire to terminate the marital relationship without regard to fault. Whether the rift was brought about by his attentions to another woman, which the wife condoned, by the intoxication of prosperity and night life, by rivalry for the affections of the child, or by other undisclosed causes, physiological or psychological, we think that the husband was the aggressor throughout. "His previous conduct, though it may fall short of cruelty, falls still further short of conjugal kindness." *Schriver v. Schriver,* 185 Md. 227, 44 A. 2d 479, 487. If we had any doubt on this point, we would lean towards

agreement with the Chancellor who heard and observed the parties and witnesses. *Stritmater v. Stritmater,* 187 Md. 699, 49 A. 2d 648, 654; *Nicodemus v. Nicodemus, supra; Meyers v. Murphy,* 181 Md. 98, 104, 28 A. 2d 861.

On the question of custody, it is sufficient to observe that the Chancellor's decree provides that the child shall remain at McDonogh and for access by both parents, subject to further order of Court. No objection is raised to the amount of alimony or counsel fees allowed.

*Decree affirmed, with costs.*