## GEISEY *v.* GEISEY
[No. 155, October Term, 1947.]

620

*Decided May 26, 1948.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, and HENDERSON, JJ.

*Avrum K. Rifman* and *Joseph O. Kaiser,* with whom were *Thomas J. Kenney* and *Kenney & Kaiser* on the brief, for the appellant.

*T. Barton Harrington* and *Eugene A. Alexander, III,* for the appellee.

COLLINS, J., delivered the opinion of the Court.

Frances B. Geisey, the appellant, and James M. Geisey, the appellee, were married in Baltimore City on the 3rd day of August, 1943. On October 28, 1944, the appellant filed a bill of complaint against the appellee for a divorce *a mensa et thoro,* alimony *pendente lite,* and permanent alimony. The appellee filed an answer to this bill on November 13, 1944. On February 6, 1947, the appellee filed a cross-bill alleging that the appellant had abandoned

and deserted him on May 25, 1944, and asked for a divorce *a vinculo matrimonii*. Appellant filed an answer denying the allegations of her husband's bill. After testimony taken in open court which brought out the facts hereinafter recited, the chancellor signed a decree granting the appellee, James M. Geisey, a divorce *a vinculo matrimonii*, dismissing the bill of complaint of the appellant against the appellee, awarding counsel fee to be paid by the appellee, and ordering that the appellee pay the costs of the suit. From that decree the appellant appeals.

At the time of the marriage of the parties, she was twenty-seven years of age and he was forty-seven. Both had been previously married. At the time of appellant's marriage to appellee, she had a child then about five years of age by her former husband. No children have been born to the appellee and the appellant. The parties had known each other for about twelve years before their marriage. The son by her previous marriage, by agreement of the parties, lived with her mother, the child's maternal grandmother, Mrs. Cora Hammerbacker, first at 3815 Chatham Road in Baltimore. The appellee later purchased a house at 103 West 29th Street where his wife's mother had an apartment, with the understanding that his wife's child was to live there. After a wedding trip to New York the parties to this suit moved to an apartment over the appellee's place of business on Exeter Street in Baltimore. This apartment was well furnished and comfortable. At the time of the marriage the appellant was in good health and weighed about 128 pounds.

The appellee, Mr. Geisey, was engaged in the vending machine business which kept him up until two or three o'clock in the morning. He usually slept until mid-afternoon. He gave his wife $30 per week, out of which, at his insistence, she paid her mother $10 a week for maintaining her child. The husband purchased all of her clothes and paid for most of the groceries and food used in the home. However, he put unusual restrictions on his wife. Before her marriage to the appellee, the

appellant told him voluntarily that after she obtained a divorce from her first husband she had become pregnant by another man, but no child was born. She said she thought she should tell him of this unfortunate occurrence.

Appellee did not want her friends to come to the house to see her. She was not allowed to go to the grocery or to do the family marketing. She was not permitted to go to the motion picture theatres, because he said he never knew who would come in and sit next to her. If she desired to go shopping in a department store he objected. When she was allowed to go she was required to return within a certain length of time. If she was late in returning he would use harsh words toward her. Once a week on Thursday evening she and her husband went to Maxim's Restaurant for dinner. He compelled his wife to sit facing the wall or the kitchen, because he had an idea that his wife's mind wandered and she was "not wholly with him". Her husband stated that the reason he put these restrictions on his wife was because "she is the type of person if she takes a few drinks she is putty in your hands, if you want to know the truth".

He stated on one occasion when he had a place for ball and pin games on York Road, he went there to make a collection with his wife and another man. After his collections were made they had a few drinks and finally his wife put her feet on the table. She explained this occurrence by saying that she was sitting down at the time and her foot itched and she removed her shoe and rested it on the chair and scratched her foot, but did not put her foot on the table. Mr. Geisey ordered the drinks on that occasion.

The appellant's sister and sister-in-law were in the entertainment business and the husband objected to his wife associating with them. She stated that the only times she had been in a night club during their married life was when the appellee took her to one in New York on their honeymoon. After four months of married life she lost about twenty pounds and was extremely nervous.

A doctor, who treated her at that time, testified that she was slightly anemic and in a highly nervous condition. He advised her to get out in the air and sunshine.

The appellee stated that in December, 1943, when Mrs. Geisey's mother was moving into the 29th Street property, appellant had a cold but wanted to go and help her mother move. He objected to this and he said that she went into a rage and said to him that his "light was out". When asked what she meant she pointed to a light on the wall and said that when the bulb was out it was finished between them. She then left to help her mother move although he suggested she hire someone to do this.

One afternoon in January, 1944, she went to visit her mother and found that her sister-in-law and mother had been invited by a friend to dinner. They asked the appellant to go with them. She tried to call her husband at his office but was unable to locate him. She accompanied her mother, her son and her sister-in-law to the dinner in a private home. In the party were the appellant, her sister-in-law, her mother, her son, two girl friends, and the hostess. Mr. Geisey said he called her at her mother's home about six o'clock to tell her he was coming for her but no one answered the telephone. He said he tried to call her again in forty-five minutes but received no response. He became alarmed, went to the house and found it in darkness. She returned to her mother's home about 7:30 P.M. and called her husband. He wanted to know where she had been. She told him that she had made several attempts to locate him but could not find him. He became angry and censured her for going out without his permission because the sister-in-law and the sister-in-law's sister were entertainers in night clubs. He said: "Well, you have done what you want to do, and now I am going to do what I want to do." He told her to see her lawyer in the morning. She remained at her mother's home for eleven days.

At the end of that time a reconciliation was effected and she returned to her husband on Exeter Street. She claims at the time that reconciliation was made the ap-

pellee's lawyer said he thought the husband had been rather harsh with her. She said that her husband promised that if she came back she could have her friends come to see her, and she would be allowed to go shopping and to the grocery store and lead a normal life. Relying on these promises she returned but conditions were very little better. He said at that time he told his wife that he did not want her to go to night clubs and places of public entertainment without him. He continued to take her out once a week to the restaurant, but insisted that she sit facing the wall or the kitchen.

Appellant's brother had just come back from overseas. On his birthday, May 24, 1944, his mother decided to have a small dinner party for him. He had been out of the country for nineteen months. She invited the appellee and the appellant to the party. This was on a Thursday when the appellant and the appellee usually went out to dinner together. The appellee said that he could not "make it". He said that he did not want to go because it would be too crowded at her house. When told that the party was to be at a restaurant, he declined because he said he was busy. He told his wife that she could do as she wanted about it. On the night of the party Mr. Geisey drove her to the restaurant. Due to the delay of the appellee in getting out of bed, they arrived twenty minutes late and after the dinner had started. He did not go in but told her after the dinner was over to go either to her mother's house or come home. After the party was over her brother suggested that the appellant, their mother, and himself go to the Belvedere Hotel and have a bottle of champagne. The appellant insisted that he call her husband first. He called the husband who said that if the appellant went it would be without his permission. The three then went to the mother's home about 9:30 P.M., where the brother was staying during his furlough. When they arrived there the telephone was ringing and Geisey wanted to know whether his wife was ready to go home. She stated that it was still early and she would like to stay a little

longer. He said he would get in touch with her later. Her husband did not call her until about two or two-thirty in the morning, when he asked her if she was ready to go home. She replied that she had been ready for some time and wondered why he had not called her. He said: "You still do not sound like you're ready to come home." He then said that he had about three-quarters of an hour's work to do and he would come for her after he finished his work. She then told him she was not going home and was going to stay there. She testified that she thought that if she waited a few days he would call and promise that conditions would be changed and she would try again and see what she could do.

On the following Sunday, the appellant went to her husband's home in his absence and took away some of her clothing. Appellee, seeing that she had been there, called her up and volunteered to bring her remaining things to her. This was done a few days later. A week following the separation the appellant, on her own intiative, went to see appellee's attorney because that attorney had previously told her if she had any more trouble with her husband to come and talk to him and he would see what he could do. On this visit to the husband's attorney, one week after the separation, he told her that her husband wanted her to return a fur coat, a diamond engagement ring and a diamond sapphire bracelet, which he had given her. She did not return them. Her husband sent her $30 a week for two weeks after the separation but no more money.

In the latter part of July, 1944, he visited the appellant at her mother's apartment and suggested that they go back and live together. She said that she would think it over and he suggested that they have dinner together on the following Thursday evening to see if things could not be adjusted. She agreed to this. In the meantime, on July 24, 1944, he wrote a letter to appellant's mother notifying her to vacate his premises within thirty days where she was living with his wife's son. Appellant

then wrote to appellee cancelling the dinner engagement. In the meantime and while the appellee was sending emissaries, Mrs. Nora Gersuk and Arthur B. Johnson, to his wife to effect a reconciliation, he recorded a power of attorney which he had had his wife execute. By means of this power of attorney, on July 6, 1944, he executed a second mortgage upon the property at 103 West 29th Street, title to which had formerly been in the names of the appellant and the appellee at tenants by the entireties. This second mortgage was held fraudulent and void by this Court in the case of *Geisey v. Holberg*, 185 Md. 642, 45 A. 2d 735, decided February 7, 1946. On July 17, 1944, eleven days after the second mortgage was given to Holberg, a Mr. George C. Rauchhaus, who was in the amusement business and who had known Mr. Geisey for several years and in whose place of business the appellee had put vending machines, bought the first mortgage on the 29th Street property at the request of Mr. Geisey. Rauchhaus employed an attorney to start foreclosure proceedings immediately and the auction sale of the property was held on November 13, 1944, the result of which would have been to wipe out the appellant's interest entirely in that property. This Court held the assignment of that first mortgage fraudulent. *Geisey v. Holberg, supra.*

On August 11, 1944, Mr. Geisey's attorney wrote a letter to the appellant demanding the return of the mink coat, diamond and sapphire bracelet and emerald cut diamond, which the appellee claimed to be his property and which he had bought as an investment. This demand not having been complied with, the appellee on October 28, 1944, filed a replevin suit to recover those articles. On the same day the appellant filed her bill of complaint for a divorce *a mensa et thoro* as hereinbefore recited.

If it is found that the husband in this case left the wife, the abandonment here charged is constructive. Under these circumstances for a wife to be entitled to a divorce it must appear from the evidence that she had

sufficient cause to leave her husband. His conduct may be such to give such cause even though it may not amount to cruelty. It is a well established principle in this State that acts which may not constitute legal cruelty in themselves may nevertheless justify the injured party in leaving the marital domicile and entitle that injured spouse to a divorce *a mensa et thoro* on the ground of constructive desertion. *Kruse v. Kruse,* 179 Md. 657, 663, 22 A. 2d 475; *Fischer v. Fischer,* 182 Md. 281, 282, 34 A. 2d 455; *Miller v. Miller,* 185 Md. 79, 82, 42 A. 2d 915; *Nicodemus v. Nicodemus,* 186 Md. 659, 48 A. 2d 442; *Robertson v. Robertson,* 187 Md. 560, 564, 565, 51 A. 2d 73, 75.

As has been stated by this Court, it is not the function of the courts to arbitrate family quarrels. The duty of the court is to determine upon the evidence whether either of the parties to the suit has been guilty of such conduct as would make a continuance of the marital relationship inconsistent with the health, self-respect, and reasonable comfort of the other. *Schwartz v. Schwartz,* 158 Md. 80, 90, 148 A. 259; *Singewald v. Singewald,* 165 Md. 136, 146, 166 A. 441; *Bradshaw v. Bradshaw,* 189 Md. 322, 324, 325, 55 A. 2d 719, 720.

The evidence here shows that after the marriage the wife lost weight, became anemic and highly nervous. From the evidence in this case the husband's treatment of the wife could readily have caused that condition. In this day and time for a husband to impose such restrictions on the woman he married and whom he had known for twelve years, seems incredible. Without repeating the testimony, it is clear that he forbade his wife doing that which every wife naturally and normally does without any interference from her husband. He forbade her to go to the grocery, to visit the department stores except under stringent conditions, forbade her to go to motion picture theatres and, when he took her out to dinner compelled her to sit facing the wall. He did not desire her to associate with her immediate family or to have other friends. It is difficult to see

how a woman could maintain her health, self-respect, and reasonable comfort under such conditions. A wife, of course, should not be compelled to endure such treatment by a husband. As to her previous indiscretion she frankly and voluntarily told him of this before the marriage. If, knowing this, he did not intend to treat her as a wife should be treated, he should not have married her.

Abandonment as a marital offense contains two elements, the ending of cohabitation and the intention of the offending party to desert. *Simmont v. Simmont*, 160 Md. 422, 153 A. 665; *Boyd v. Boyd*, Unreported, 177 Md. 687, Reported 11 A. 2d 461; *Dunnigan v. Dunnigan*, 182 Md. 47, 50, 31 A. 2d 634. In this case the appellant testified that she had no intention of deserting her husband on May 25, 1944. Her actions bear out this testimony. We find that one week after that date she went to see her husband's attorney in an effort to effect a reconciliation. She was there met with a demand for the return of a mink coat, a diamond engagement ring and a diamond sapphire bracelet which she claimed her husband had given her, and which he claimed was only an investment on his part. The testimony further shows that in the latter part of July, 1944, he suggested a dinner engagement for the purpose of effecting a reconciliation. In the meantime and before the date of the dinner engagement he wrote a letter to appellant's mother notifying her to vacate his premises, which she occupied with appellant's son. It therefore clearly appears that any effort on the part of the wife to effect a reconciliation was rebuffed by the husband.

As to the husband's claim of his efforts to become reconciled to his wife, these efforts do not appear to have been made in good faith. It has been many times stated by this Court that if one spouse leaves the other without cause or constructively deserts her, as we find the husband did in this case, and repents and proposes to renew the cohabitation and that other refuses, it constitutes desertion by the one refusing from the time of the re-

fusal, *provided the offer to return is made in good faith* and is free from improper qualifications and conditions and is really intended to be carried out in accordance with the performance of the duties and obligations of the matrimonial status. *Simmont v. Simmont, supra; Wise v. Wise,* 159 Md. 596, 598-600, 152 A. 230; *McClees v. McClees,* 162 Md. 70, 74 and 75, 158 A. 349; *Pitts v. Pitts,* 181 Md. 182, 190, 29 A. 2d 300; *Zukerberg v. Zukerberg,* 188 Md. 428, 433-434, 53 A. 2d 20, 22.

In this case the husband was insincere in his offers of reconciliation. They were not made with the intent on his part to perform the duties and obligations of matrimonial relationship. The actions of a husband, after making offers of reconciliation and while those offers were pending, to notify the wife's mother and child to vacate his premises, are not those of a husband sincerely desiring reconciliation. The demand of the return of valuable articles which he claimed to be investments but which she claimed to be gifts, is not a sign of marital devotion. To fraudulently obtain a power of attorney from the wife, use that power of attorney to execute a second mortgage, and then have the first mortgage fraudulently foreclosed in order to deprive the wife of her interest in the property owned by them in the joint names, are not the actions of a husband sincerely seeking reconciliation. We must conclude that the husband's offers of reconciliation were not sincere, or made in good faith. We must also conclude that the treatment of this wife by her husband was sufficient to justify her in leaving and refusing to return to the marital domicile, and such as to entitle her to a divorce *a mensa et thoro* and to deny him a divorce *a vinculo matrimonii* and the decree will be reversed to that extent.

During the trial of the case, in an effort to show the net holdings and earnings of the husband for the purpose of determining alimony, the appellee was served with *a subpoena duces tecum* directing him to produce copies of his 1944, 1945, and 1946 Federal income tax returns and any financial statements showing his net

profit and loss from his business and personal investments during the years 1944, 1945, 1946 and 1947, inclusive. He stated that these papers were in the hands of his accountants and he could not locate his copies. Thereupon a similar subpoena was directed to these accountants. An objection was made to the accountants disclosing any information in these returns by reason of the provisions of Article 75A, Section 11, of the Annotated Code of Maryland, 1939 Edition, which under certain circumstances may make information given an accountant a privileged communication. Because of the provisions of that statute the court sustained the objection and refused to allow the accountants to testify. The attorneys for the appellant later asked that the copies of the returns, which the accountants had in court, be handed to the appellee for the purpose of showing them to him and asking him if they were copies of his returns. This was denied by the chancellor. Whether it was proper to deny the testimony of the accountants is not necessary for us to decide, but there appears no reason why the copies should not have been handed to the appellee for his examination and, if they were copies of his income tax returns, there was no reason why he could not testify from those copies, he having previously said that he could not locate his copies. *

The cause will be remanded for the purpose of denying the appellee a divorce *a vinculo matrimonii,* and for the purpose of awarding the appellant a divorce *a mensa et thoro* with such alimony as may be determined proper by the chancellor. That part of the decree providing for the payment of counsel fees and costs of suit by the appellee will be affirmed.

> *Decree reversed in part and affirmed in part, and case remanded for further proceedings, costs to be paid by the appellee.*