BLADES *v.* BLADES

[No. 80, October Term, 1949.]

*Decided February 10, 1950 .*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*J. Calvin Carney* for the appellant.

*Eldridge Hood Young* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal from a decree granting the husband a divorce *a vinculo* and dismissing the wife's cross-bill for alimony. The bill charged adultery, the cross-bill abandonment and adultery. The transcript comprises 2700 pages, the appendices 900. Much of the 900 pages relates to the wife's charges of adultery, which have been abandoned at the argument. More is irrelevant or repetitious.

The parties were married in 1918 and lived together happily for twenty-five years. Three children and a foster child are all of age, married and no longer at home. From 1919 to 1943 the couple lived, and the wife still lives, in a house on Park Avenue in Baltimore, owned by them as tenants by the entireties. In 1943 the husband left the house and took a room on Cathedral Street, where he still lives. He says he left and continued to stay away because she made life unbearable by groundless suspicions and incessant charges against him and one woman or another. Nevertheless they continued marital relations sporadically, frequently during 1947 on week ends at the Park Avenue house or at their "shore place" or on trips, less frequently in prior years, and last of all on a Christmas visit to Norfolk, from which they returned on December 29, 1947. They both profess to have hoped for an eventual "reconciliation".

The husband says that about 1943 the wife's nature seemed to change completely and she became as different as Doctor Jekyll and Mr. Hyde. At least as early as 1945 he said she was mentally sick and not accountable for her actions, and urged that she receive psychiatric attention. In addition to the undisputed testimony of the husband and other witnesses to her high character as a wife and mother for twenty-five years, her own testimony lends color to the suggestion of sudden mental illness and lack of accountability since 1943. At the argument, however, her counsel denied any suggestion of mental illness as vigorously as he denied the charges of

adultery. We are unable to pursue any such possibility, as the evidence does not establish, though it does suggest, mental illness.

Practically throughout their married life, the wife rented rooms in their home. After he left the house, she continued to take "roomers". We are told that this was a friendly house, where everyone came and went as he chose and doors—front door or bedroom door—were seldom locked. At least two third storey rooms and the second storey front room were rented or for rent. Mrs. Blades' room was the second storey back, and behind it was a smaller room, which could be reached only by going through her room. This smaller room from time to time was occupied by Mr. Blades, by their son Webster, Junior, by others members of the family and by young friends of Webster, Junior, with him or, she says, sometimes without him.

At the trial the husband charged five specific acts of adultery, all at the Park Avenue house, all in 1947 except one shortly after midnight at the end of the year, all but one supported by evidence (true or false) of one or more eye-witnesses, which falls short only of *flagrans delictum.* Compromising situations the wife faces with an air of injured innocence and a modernistic attitude of *Honi soi qui mal y pense,* as if only some evil Puritanical mind would draw inferences against her. Some direct testimony is met with indignant denial. In her reply brief it is said that, "as the record shows", four named witnesses, three of them roomers who showed no bias against her, "each gave obviously perjured testimony" for the husband "in respect of four of the five alleged episodes from which adultery by the [wife] was sought to be inferred." In some respects witnesses on both sides are (in the words of counsel) "a motley crew". However, even if we could escape drawing the usual inferences from conduct, we could not thus summarily dispose of questions of veracity. Not having seen the witnesses, we are not able to pronounce any of the testi-

mony "obviously perjured" except that of Jack Ashley, who will be mentioned presently.

At the conclusion of the argument below Judge France said, "With respect to the original bill, the Court finds the charges of adultery proven". As the case turns ultimately on questions of veracity and the trial judge saw and heard the witnesses (except perhaps one whose pretrial deposition was offered), the rule that the judge's findings of fact will not be set aside unless shown to be clearly wrong, is applicable with full force and should be controlling. It is unnecessary and perhaps inappropriate to say more.

Nevertheless, the fact is that the 900 pages of the appendices not only fail to convince us that the trial judge was clearly wrong, but indicates that he was clearly right. We are told that he considered three of the five alleged acts insufficiently proved. Without passing upon any of the five except the last, we are satisfied that Mrs. Blades and Jack Ashley were guilty of adultery.

Ashley was a plumber. In the autumn of 1947 he rented a third storey room where for a month or two he left some clothes and occasionally spent a night. While he was a roomer, he did a gratuitous plumbing job for Mrs. Blades at the shore and later one at the house. The evening after he and she had driven to the shore and back and while they were in the dining room, Blades came in. He says (they deny) they were "beastly drunk". He asked where this "bum" had come from and, according to all three of them, made himself quite disagreeable. She says she told him she "did not think he had been very polite"— to "Jack". On December 31, 1947 Ashley telephoned Mrs. Blades (so they say) asking if he could rent his old room for the night. She told him it was rented, and she had no room for rent, but if he "wanted to take a chance upon bunking with little Webster" he could. He (they say) came in before she did and went to bed in the back room, she came in later and went to bed in her room, without either seeing the other. Webster, Junior,

never came in. The only other person in the house was a third storey roomer.

Blades says he watched around the house after midnight, saw Mrs. Blades go in the house, heard her voice and a man's voice, went in the house, into her room, turned on the light and saw her in bed with Ashley. She and Ashley deny that Ashley was ever in her bed or was in her room until he went in after Blades went in and created a disturbance that aroused the household. It is said that Blades' story is incredible because Mrs. Blades telephoned for the police, and the two police and the third-storey roomer remember no statement by Blades that he had found Ashley in bed with his wife. In Blades' alleged plight there is no conventional course of conduct. Perhaps he desired no needless publicity. Perhaps he was less grieved at his wife's guilt than he was pleased at obtaining evidence of it, though there is no evidence of connivance on his part. We do not pass upon the details of his testimony.

Ashley testified that he was married and had been separated four or five years. Later, under cross-examination, he admitted—or asserted—that his former wife had divorced him (somewhere at some time) and remarried and he had been "secretly" married eight years —or two or three years—and for months had had an apartment with his wife in Baltimore. Immediate summons was issued for his wife, but she evaded it that day and with his assistance thereafter. His testimony is largely contradictory, and wholly unworthy of belief. Without going into details of any of the testimony, it is sufficient to say that we find in the copious explanations given no adequate reason (a) why Ashley should have rented a room on New Year's Eve, or even in the autumn, (b) why there was no other room for him in the house that night, or (c) why in any event Mrs. Blades should have taken him into a room which was really a part of her own room. She says she did not know he had a wife or a Baltimore apartment. But she had no reason to consider him qualified to act as guardian of her bed-

chamber. We cannot avoid drawing the only possible inference from such circumstances. Whether the circumstances be regarded as corroborating Blades' testimony, or *vice versa,* or Blades's testimony be altogether disregarded, the result is the same.

*Decree affirmed, costs to be paid by Webster S. Blades.*