## SULLIVAN v. SULLIVAN
### (Two Appeals in One Record)
[No. 136, October Term, 1951.]

*Decided April 3, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*John Sumner Wood* for the appellant.

*John R. Reeves* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Carrie Miller Sullivan entered suit in the Circuit Court for Montgomery County against her husband, Kenneth Thomas Sullivan, for limited divorce, alimony, and custody of their three children, alleging cruelty and constructive desertion. Her husband filed a cross-bill for a limited divorce on the ground of desertion. The chancellor entered a decree (1) granting the husband a limited divorce, (2) awarding the wife the custody of the three children, and (3) ordering the husband to pay $425 per month for their support and education. The wife appealed from the divorce award, the husband from the custody award.

The parties were married in Washington in 1931. At the time of their separation on June 4, 1950, they were residing on Kenwood Avenue in the fashionable Chevy Chase section near Washington. Complainant is 47, and her husband 45. Their children are Robert, born in 1932, John, born in 1937, and Kenneth, born in 1941. Both of the parties have been heavy drinkers, and their life has been turbulent for many years. The pattern of their life was displayed in 1935, when defendant's intoxication in a night club in New York unnerved his wife, and shortly afterwards they had a repetition of the experience in Florida.

Complainant testified that in 1938 her husband was so abusive that on several occasions she had to leave the house and take refuge with friends.

Complainant further testified that in December, 1939, she accompanied her husband to a convention in Baltimore, and after he became intoxicated he beat her, and she took another room and called a doctor.

There was some dispute as to the details of the celebration on Christmas eve, 1945. Robert testified that his father went into his mother's room and tried to choke her. He said that his aunt ran him out of the room. The aunt, however, denied the story.

There was another harrowing occasion in 1947. Defendant testified that his wife went out for some drinks, and when she returned she went on one of her tirades, and took Kenneth into her room and locked the door. Defendant further testified that since complainant was raving and cursing, and Kenneth, who was then 6, was crying, he entered her room through a window to get the boy so that he could put him to bed. Complainant called the police. Defendant asserted that she tried to strike and kick him, but she finally quieted down and went to bed.

Another episode occurred on Labor Day, 1948. Defendant testified that when they arrived home that night from the club, his wife called Robert, then 16, to come downstairs and beat him up, but he convinced Robert that his mother was drunk.

By this time Robert had turned definitely against his father. It appeared that during the summer, when complainant was in a sanitarium, defendant scolded Robert about staying out late at night. On November 19, 1948, when Robert returned home very late, defendant got out of bed and met him at the door. A scuffle ensued between father and son, and the son's fist went through the glass window of the door.

Three days after defendant's altercation with his son, complainant filed a suit for a limited divorce, but the case was dismissed several weeks later and complainant resumed cohabitation with defendant.

In February, 1949, complainant filed her second suit for a limited divorce, but that suit likewise was dismissed and again she resumed cohabitation.

In the summer of 1949 defendant took his wife and children on a vacation to Rehoboth Beach. Complainant testified that while at the resort her husband struck

her on the chest. The boys testified that they saw the bruise.

The next altercation was on New Year's eve. Complainant testified that after they returned home from their celebration at the club, defendant grabbed her and was starting to choke her when Robert came to her rescue. Defendant explained that his wife was drunk, and that when they arrived home she fell out of the automobile, and after he picked her up, she fell a second time. He picked her up again and carried her up the front porch. While he was unlocking the door, she hit him on the head with one of her shoes, and began screaming for Robert and shouting that his father was trying to kill her. Defendant declared that Robert knocked him unconscious.

The next altercation came on May 13, 1950. Defendant testified that while he was discussing some problems with his wife, she threw a kitchen utensil at him. Robert, then 18, rushed in and knocked his father over the kitchen sink. Defendant escaped into the living room, but Robert pursued him and struck him on the chest, knocking him over the table.

The climax came on the night of June 4, 1950. Complainant took the boys out to supper, and after they returned defendant went out. When he arrived home, he went to his wife's room, and she ordered him to get out. He complained to her that she was not properly attending to her household duties. He also warned her: "I can't have you sicking Bob on me and making him believe I am going to strike you." Angered by the reproof, his wife exclaimed: "I am going to have you arrested, and I am going to make you get out of this house." Again she screamed to the boys for help, shouting that their father was going to kill her. He locked the door as his wife advanced toward him. The boys pounded on the door, and he decided to let them in. Just as he was opening the door, his wife threw an ash tray at him and hit him on the head. Defendant testified: "I just turned around with the children on one

arm, and I slapped her under the chin. She went over on the bed." His wife summoned the police. Two policemen arrived and took her to the police station, where she swore out a warrant for her husband's arrest for assault and battery. It was then that complainant left her husband, the boys going with her. Defendant stayed in the house several days and then went on a western trip. On June 9, 1950, complainant filed the instant suit. She moved back into the house and stayed there until the first of September. When she moved out, defendant moved in.

We are unwilling to reverse that part of the decree which grants the divorce to defendant. We have always adhered to the rule that sallies of passion, rudeness, and the use of abusive and profane language do not constitute cruelty as a ground for divorce. *Hastings v. Hastings,* 147 Md. 177, 181, 127 A. 743; *Short v. Short,* 151 Md. 444, 135 A. 176; *McKane v. McKane,* 152 Md. 515, 137 A. 288; *Wendel v. Wendel,* 154 Md. 11, 139 A. 573; *Bonwit v. Bonwit,* 169 Md. 189, 181 A. 237; *Faulkner v. Faulkner,* 176 Md. 692, 4 A. 2d 117. Although there were a number of altercations when complainant slapped and kicked at her husband and he fought back, it is significant that in 1948 she dismissed her first suit for divorce and returned to her husband and resumed cohabitation, and in 1949 she dismissed her second suit and again returned to her husband and resumed cohabitation. It is a settled rule in Maryland that a wife, by returning to her husband's home and living with him after the dismissal of her first suit for divorce on the ground of cruelty, condones his cruelty prior to that time, but his subsequent cruelty revives the previous offenses. *Collins v. Collins,* 184 Md. 655, 42 A. 2d 680; *Sensabaugh v. Sensabaugh,* 186 Md. 348, 46 A. 2d 635; *Robertson v. Robertson,* 187 Md. 560, 51 A. 2d 73. In this case the drunken brawls in 1949 and 1950, disgusting though they were, did not constitute cruelty.

The fight on the night of June 4, 1950, is of particular interest because it was the ultimate cause of the separa-

tion. Defendant testified that he wanted to speak to his wife about some of their problems, and when she flew into a rage and screamed for her sons and threw the ash tray at him, he slapped her and she fell upon the bed. The chancellor was of the opinion that defendant did not intend to cause his wife any bodily harm.

It is accepted in this State that the conduct of a spouse may not amount to cruelty and yet may justify the other spouse in leaving the marital domicile and entitle that spouse to a divorce on the ground of constructive desertion. *Nocodemus v. Nicodemus,* 186 Md. 659, 48 A. 2d 442; *Robertson v. Robertson,* 187 Md. 560, 51 A. 2d 73; *Geisey v. Geisey,* 190 Md. 618, 627, 59 A. 2d 319; *Eberwein v. Eberwein,* 193 Md. 95, 65 A. 2d 792, 795. However, complainant appeared to be at least as much to blame as defendant for the disgusting quarrels. As the chancellor said, complainant was a headstrong woman who went into tirades and tantrums whenever she found that she could not dominate her husband. If any bodily harm came to complainant, or if she had any fear of bodily harm, it was usually when she was intoxicated. Her husband provided her a beautiful home, gave her money for her needs, allowed her to use his automobile, and took her on vacation trips to summer and winter resorts. He also established a trust fund for the maintenance and education of each of the three sons. When she was getting $75 a week from her husband, and had unlimited charge accounts in the Washington stores, she sued her husband for non-support. She also received substantial income from securities, which her husband had put in her name. The chancellor declared that the impression which she made upon him, after seeing and hearing her testify on several occasions, was that her controlling desire was to get from her husband all the money she could.

Where the decision depends upon the credibility of the witnesses, the Court of Appeals will give weight to the fact that the chancellor had the opportunity to see and hear the witnesses and to observe their expression

and demeanor on the stand, and the Court will not set aside the chancellor's findings of fact unless they are clearly not supported by the evidence. *Lickle v. Lickle,* 188 Md. 403, 52 A. 2d 910; *Blades v. Blades,* 194 Md. 505, 71 A. 2d 293; *Harp v. Harp,* 198 Md. 485, 84 A. 2d 895.

In the instant case the chancellor saw and heard the parties on several occasions and had the opportunity to learn about their motives and shortcomings. The chancellor expressed the opinion that defendant's act on the night of June 4, 1950, *i.e.*, slapping his wife over the bed when she flew into a rage, was not as bad as his acts on previous occasions. The chancellor reached the conclusion that complainant used the quarrel of June 4, 1950, as a pretext on which to base justification for her desertion. It is a general principle that the husband, as the head of the family, has the right to determine the domicile of his family, and it is the wife's duty to accept the place selected and maintained by her husband unless it would impair her health or safety or unreasonably interfere with her comfort, or there are circumstances amounting in law to a legal excuse justifying her in refusing her husband's request to stay with him. *Miller v. Miller,* 185 Md. 79, 84, 42 A. 2d 915.

The chancellor noted that complainant swore out a warrant for her husband's arrest for assault and battery, and while he was testifying at his trial before the jury, which acquitted him, his son John stood up in the court room and said in a loud voice: "That is a lie." When the divorce case came up for hearing, one of the members of the bar testified that he heard complainant tell the boy in the court room: "He is a jackass, and he is making a fool of himself. Stand up and call him a liar." The chancellor stated that complainant never undertook to deny the attorney's testimony, and added: "When she has the audacity to do such a thing in court, I must believe the husband when he says she sicked the boys on him in their home."

Finally, we affirm the award of the custody of the three boys to complainant. At the time of the trial, Robert was a student at Williams College, while the other two boys were living with their mother in an apartment house in Bethesda. The boys informed the Court that they desire to live with their mother, and it is clear that they would not be able to live harmoniously with their father.

*Decree affirmed, the costs to be paid by Kenneth Thomas Sullivan.*